## PHILADELPHIA & READING COAL & IRON CO. v. DELAWARE, LACKAWANNA & WESTERN COAL CO.

### No. 6102.

Circuit Court of Appeals, Third Circuit.

Feb. 17, 1937.

Wm. Clarke Mason, of Philadelphia, Pa. (Alexander C. Neave and Charles H. Walker, both of New York City, of counsel), for appellant.

Pennie, Davis, Marvin & Edmonds, of New York City (W. Brown Morton and Ernest H. Merchant, both of New York City, and Wm. Steell Jackson & Son, of Philadelphia, Pa., of counsel), for appellee.

Before BUFFINGTON and THOMPSON, Circuit Judges, and MARIS, District Judge.

BUFFINGTON, Circuit Judge.

In the court below the plaintiff, assignee of patent No. 1,748,335, to Eliot Farley and Nathaniel R. Landon, for method of treating coal and product thereof, brought suit against the defendant charging infringement of the five claims thereof. That court held the fifth claim, to wit, the method of restoring the luster and improving appearance of discolored coal, which comprises treating it with oxalic acid, valid and infringed. Thereupon defendant took this appeal, and the sole question before us is whether the recited claim is valid. If so, infringement is conceded.

The problem involved was accurately stated in the application for the patent, as follows:

"Fresh mined coal, that is coal which is mined and shipped for immediate consumption has a jet black color and a bright luster. Owing to the seasonal demand for coal, large quantities of fresh mined coal are placed in storage whenever possible in order to avert a shortage in the fall and winter months. Such coal is known in the trade as 'storage' coal.

"Coal so stored does not deteriorate as a fuel but the physical appearance is altered. The coal becomes a dull grey in appearance and a considerable portion of it becomes badly discolored by metallic compounds. The consuming public, who are accustomed to recognize anthracite coal by its jet black color and luster often assume that coal which has been held in storage and has thus lost its characteristic appearance is poor in quality. The original 'fresh mined' coal appearance cannot be restored by ordinary washing. Consequently serious losses are sustained by the producer because this storage coal does not command the price of 'fresh mined' coal, although analysis indicates that the change is only one of appearance and there is no loss of fuel value or consequent change in chemical composition.

"It is the object of the present invention to provide a method of treating storage coal to remove the surface discoloration and restore its original characteristic color and bright luster."

The specification stated, and the finding of the court below, as well as our own, is that "these discolorations have never been removed in a practical way by any previous known treatment."

The commercial advantages of the patent, which are not disputed, were summarized by a witness as follows:

"We have had occasion since we have been processing coal under this patent to sell some storage coal which was not processed. At our storage plant at Hampton, New Jersey, our breaker in which the processing plant was located burned down. We had had approximately four hundred thousand tons in stock there and we had picked the greater part of it up and used the process and sold it at the going price or at the market price for first quality coal, fresh mined coal. After this breaker burned down we had about seventy-five hundred tons that we endeavored to sell, couldn't sell at the full market price, and finally were obliged to sell at from two dollars and a half to three dollars and a half under the market price in order to clean it out. That amount of coal wouldn't warrant building a new plant.

"In the ordinary sale of the processed coal we do not make any distinction whatsoever between the processed storage coal and the newly mined coal."

It was further shown that all of the large coal companies, except the defendant, had taken licenses under the patent, and the proof is: "The plaintiff company has been treating coal with this oxalic acid wash since 1929. We have treated, in that time, about five hundred thousand tons. The licensees under this patent are all of the large companies who use storage plants, with the exception of the defendant company and the Susquehanna Collieries Company; and the Susquehanna Collieries Company do not store in sizes at storage plants, they store run-of-mine at the breaker and then pick that up in the large pieces and break it, and put it through the breaker with their other coal, thereby getting fresh fractures on the coal at the time it is mixed with the fresh mined coal that goes out. I think there are six licensees in all.

"By Mr. Morton: Q. Are these copies, these documents which I hand you, of licenses you have issued under this patent? (Papers are shown to the witness.) A. Yes, they are.

"The Witness (continuing): All these companies and our company and the defendant company have storage yards for coal after it has been sized to the various commercial sizes.

"Those are the only companies which have yards of that character in the anthracite industry. All of them are licensed except the P. and R. and the Susquehanna Collieries. The latter company doesn't have a storage yard; they store it at the collieries in run-of-mine. * * *

"All these licensees have paid our company the royalty on the processed coal that they have processed since the issuance of the patent. The total coal, including our own, which has been processed under this patent, amounts to upwards of a million tons."

As we have said, no one used this oxalic acid process prior to the patent, and that its use was an original conception and one the art was not solving and did not think solvable is shown by the fact that shortly before the patent, the problem of rusty coal was submitted to a chemist of long practice, who made this report: "*Rusty Coal*:— The general and varied conditions surrounding this problem indicate little likelihood of satisfactory economical solution of it. As for rusting in the cars in transit, I suggest making a test on two cars adjacent in the train. Do nothing to one, but wash the other with one pound of tri-sodium phosphate dissolved in 100 gallons of water. It will of course be necessary for the consignee to make observations on the two cars when they are emptied. Unless of course there should be a marked difference in the looks of the coal from each of the cars, the treatment would be useless."

In view of these facts, we find ourselves in accord with the conclusion of the court below that the fifth claim of the patent is valid, and its decree is accordingly affirmed.