**GOULD–NATIONAL BATTERIES, INC.,**
a corporation of Delaware, and Bureau
Technique Gautrat, S.A.R.L., a Society
of the Republic of France, Plaintiffs,

v.

**GULTON INDUSTRIES, INC.,** a corpora-
tion of New Jersey, Defendant.

Civ. No. 228–61.

United States District Court
D. New Jersey.

June 8, 1964.

Pitney, Hardin & Kipp, Newark, N. J., William P. Reiss, Newark, N. J., for plaintiff; Richard Russell Wolfe, Wolfe, Hubbard, Voit & Osann, Chicago, Ill.; appearing.

Kristeller, Zucker, Lowenstein & Cohen, Newark, N. J., Saul J. Zucker, Newark, N. J., for defendant; Francis T. Carr, Kenyon & Kenyon, New York City, appearing.

LANE, District Judge.

This is an action for infringement of United States Letters Patent Numbers 2,571,927 [hereinafter '927] and 2,636,-058 [hereinafter '058]. Patent '927, entitled "Electrolytic Cell and, in particular, Alkaline Cell," was issued on October 16, 1951 to Georg Neumann and Uscha Gottesmann on an application filed January 29, 1949. Patent '058, entitled "Gastight Storage Battery and Method of Manufacturing Same," was issued on April 21, 1953 to Georg Neumann on an application filed November 18, 1950. Plaintiff bases this action upon Claims 1, 2, 3 and 4 of '927, and 2, 5, 6 and 9 of '058. The patents in suit pertain to sealed, rechargeable electric cells and batteries.

Plaintiff Gould-National Batteries, Inc. [hereinafter "Gould"] is a corporation organized and existing under the laws of the State of Delaware.[1] Plaintiff Bureau Technique Gautrat, S.A.R.L. [hereinafter "Gautrat"] is a "society" or corporation existing under the laws of France.[2] The defendant, Gulton Industries, Inc. [hereinafter "Gulton"] is a New Jersey corporation.[3]

1. Principal place of business: E–1200 First National Bank Building, St. Paul, Minnesota.

2. Principal place of business: 20 Rue Henri Barbusse, Les Lilas (Seine), France. For simplicity we refer to plaintiffs as "plaintiff" or "he" throughout this opinion. It is permissible since there is a unity of interest between them for purposes of this suit.

3. Principal place of business: 212 Durham Avenue, Metuchen, New Jersey.

**612**

On or about January 19, 1949, the application which later matured into Patent '927 was assigned by the applicants to Gautrat and on or about November 10, 1950 the application which later matured into Patent '058 was assigned by the applicant to Gautrat. Since the respective dates of issuance, Gautrat has been the sole owner of all right, title and interest in and to the '927 and '058 patents.

On or about October 16, 1953, Gautrat granted an exclusive license with right to grant sublicenses, under the '927 and '058 patents, to Hermatec, S.A., a corporate entity organized and existing under the laws of the Principality of Liechtenstein. On or about October 30, 1953, Hermatec in turn granted an exclusive license with the right to grant

sublicenses, under both patents, to Gould. Since October 30, 1953, Gould has been by said grants the exclusive licensee in the United States under the patents, with the exception of certain sublicenses and covenants not to sue immaterial to the case at bar.

Defendant markets sealed, rechargeable nickel-cadmium cells and batteries in the United States. They are manufactured in France by Societe Des Accumulateurs Fixes et de Traction [hereinafter "SAFT"] a "society" or corporation existing under the laws of France. The cells have been identified by defendant with the following designations, the parenthetical reference being the designation by manufacturer SAFT for the same cells:

| | |
|---|---|
| VO .180 (VB 18) | VO 1.750 (VB 200) |
| VO .250 (VB 25) | VO D (VO D) |
| VO .500 (VB 50) | VO 4D (VO 4D) |
| VO .750 (VB 100) | VO 9 (VO 9) |

---

Plaintiff accuses defendant's cells of infringement and has presented evidence of infringement concerning VO .250, VO .500, VO 1.750, VO D, VO 4D and VO9.

This court has jurisdiction of the subject matter of and parties to this suit under the federal patent law.[4]

### GENERAL TECHNICAL BACKGROUND

An electric cell or battery is a device used for the storage of electrical energy. It operates by converting easily stored chemical energy into electrical energy when needed. A cell is the individual electricity-producing unit; a battery consists of a number of cells connected to one another in series.

There are two basic types of electric cells. One is the "primary cell," also known as the "dry cell," which is discharged once and discarded.[5] The common flashlight battery is the best known example.

The other kind is the "secondary" or rechargeable cell. Once its storage capacity is depleted it can be regenerated through the application of an electric current to the cell in the direction opposite to the cell's discharge. It is then ready again to provide electric current.[6] The ordinary automobile battery is composed of typical secondary cells in series. This suit is concerned solely with cells and batteries of the secondary type.

4. 35 U.S.C. §§ 271, 281 (1958) and 28 U.S.C. §§ 1338(a), 1400 (1958).

5. I.e. there is a single one-way conversion of chemical energy to electrical energy. When it is completed the battery is "used up" and of no further value; the chemical reactions cannot be reversed.

6. I.e. once the chemical energy is converted into electrical energy the cell can reconvert electrical energy back into chemical energy for storage, from whence the cycle may be repeated indefinitely.

The essential elements in a secondary cell are a positive electrode (the "anode") containing positive active material, a negative electrode (the "cathode") containing negative active material, and an electrolyte: the current-conducting link between the electrodes. The electrolyte may be a water solution of any one of a number of suitable chemical compounds. Sulfuric acid, $H_2SO_4$ is often used in an automobile battery; potassium-hydroxide, KOH, in the alkaline cells with which we are concerned. The electrodes are placed in the electrolyte and connected to a circuit. Often the electrodes will be separated by a sheet of non-conducting material known as a separator whose primary purpose is to prevent the electrodes from coming into contact with one another. If an anode and cathode were to touch, the cell would short-circuit and fail.

The chemical makeup of all electric cells is such that one electrode has a considerably greater electrical potential than the other. By convention, it is the anode which is deemed to have the higher potential. When the electrodes are connected by an electrical circuit, an electrical current flows through the circuit from the higher potential positive electrode to the lower potential negative one. The difference between the potential of the electrodes and thus the force with which electricity flows between them is known as "voltage." When anode and cathode become equal in potential, the flow stops; voltage has reached zero.

When a cell is discharged, its chemical energy is converted into electrical energy and the chemical composition of the electrodes changes. When electricity is fed into the discharged cell, the chemical composition of the electrodes reverts to its charged state. However, if further electric current is introduced into the cell after the electrodes have been fully charged, the cell becomes "overcharged." The electric current begins to decompose the water in the electrolyte into oxygen and hydrogen.[7] Hydrogen is generated at the cathode and oxygen at the anode. The internal pressure created by the evolution of overcharge gases presents a serious problem in the sealed cell. It is the attempted solution to this problem which has given rise to patent '927 here in suit.

The '927 and '058 patents pertain to nickel-cadmium cells. When charged, the active material on the positive electrode is nickel hydroxide in the trivalent state, $Ni(OH)_3$, which becomes bivalent nickel hydroxide, $Ni(OH)_2$, as the cell is used and discharges. The active material on the negative electrode is cadmium, Cd, which becomes cadmium hydroxide, $Cd(OH)_2$, in the discharged state. The electrolyte is a solution of potassium hydroxide, KOH. This is a chemical composition common in secondary cells.

It is useful to further classify secondary cells as having either sealed or unsealed casings. The latter are either vented or open types. In the unsealed cell, any gases generated during operation are allowed to escape, thus preventing the accumulation of gas pressure within. While gases from the atmosphere can enter open cells, vented cells are designed to permit excess gases to escape without allowing external gases entry. Moreover, vented cells, unlike open cells, prevent electrolyte from spilling out of the cell and delay the evaporation of electrolyte.

A sealed cell has several advantages over both open and vented cells. It may be charged or used in any physical position whereas vented cells must be upright during charging and open cells must be upright at all times.

Open or vented cells lose electrolyte during operation and therefore require regular maintenance for the retention of the proper amount of electrolyte. Sealed cells avoid the tendency to dehydrate.

The sealed cell may be used in a vacuum whereas open or vented cells will

---

7. By the process of electrolysis:
$$2H_2O \rightarrow 2H_2 \uparrow + O_2 \uparrow .$$

lose electrolyte and be rendered inoperable. This has particular significance with regard to cell operation in the vacuum of space.

In an open cell, electrolyte may escape to corrode or otherwise injure adjacent parts and the cell may absorb carbon dioxide from the air which has the effect of aging the cell components and thereby reducing the life of the cell. A properly constructed sealed cell will not leak electrolyte.

A sealed cell has the added advantage of safety in certain applications where explosive conditions prevail. In a mine, for example, the generation of oxygen or hydrogen and subsequent release of those gases to the atmosphere would increase the hazard of fire and explosion, and use of a sealed cell for electric power is therefore indicated.

Prior to the issuance of patent '927, many largely unsuccessful attempts were made to control overcharge gases within the confines of the cell so that safe sealing would become possible. Several main avenues of approach were used. They form the background against which the '927 patent must be measured.

Oxygen produced at the anode will recombine at the cathode, discharging it.[8] Hydrogen produced at the cathode will similarly react at the anode but at an extremely slow rate. Thus in the flooded cell if the parts of the electrodes located above the electrolyte are charged, the gases generated on overcharge will to some extent recombine with the electrodes and depolarize them, thus reducing internal pressure. The most obvious approach to pressure reduction, then, is merely to seal a cell whose electrodes are only partially submerged in electrolyte. But to be charged, an electrode must be in contact with the electrolyte. So, it was found that the portions of the electrodes not in contact with the electrolyte would not become charged. Once these portions had been discharged, there was nothing further to react with the gases generated.

A device was then sought which would enable the electrodes to be immersed in electrolyte for the charging process, but which enables them to be removed from the electrolyte during overcharge to allow the contact of gases necessary for the recombination process to occur. Inventors tried to vary the level of electrolyte so that it covered the electrodes during charge but exposed them during overcharge.[9] Or they sought to construct cells with movable electrodes which were immersed and exposed at the proper time.[10] None of these devices were wholly successful largely because of the slowness of the hydrogen-anode recombination which resulted in an excess of the gas and consequent pressure in the cell.

Another technique, exceptionally simple in concept, was the recombination of evolved hydrogen and oxygen into water. A catalyst or heated element was usually employed to effect the union of the two gases. But the technique failed since no means was found to assure that hydrogen and oxygen would be produced in precisely the two-to-one ratio necessary for the production of water. Excess hydrogen or oxygen always remained, accumulated and created pressure in the casing. The first of this genre of patents was Edison's[11] in 1912.

It is important that we understand the term "immobilization of electrolyte" as it has been used in the art. Common practice for many years has been to place

---

8. The proper term for the chemical discharge of electrodes is "depolarization."

9. Lange, et al., #2,131,592 (1938), identical with Accumulatoren-Fabrik A.G. (A.F.A.) German patent #674,829 (1939).

10. Figure 1 of patent '927 presents a mechanism for rotating discharged portions of the electrode into electrolyte for charging and charged portions out of the electrolyte to react with the excess gases. This device was not claimed.

11. #1,016,874. For an interesting and extremely complex modern approach to this technique see Tichenor patent #2,578,027 (1951), discussed below in connection with both the '927 and '058 patents.

a porous separator between the electrodes. Most of the cell's electrolyte is held sponge-like in the separator. While the separator acts as an electrolyte holder it performs its customary function of short-circuit prevention. This device is used when it is considered advantageous to keep the liquid electrolyte from flowing and splashing inside the cell. The technique, commonly referred to as "immobilization of the electrolyte," is found in a patent as early as 1894,[12] and its use probably precedes that date.

A cell is not necessarily composed of a single pair of electrodes. Often positive and negative plates and separators are assembled as a unit known as the "electrode separator pack." Several electrodes are placed together so that positive and negative electrodes alternate, with separators between them. All the positive electrodes are connected and all the negative electrodes are connected. The pack is put in a cell and the completed cells may then be arrayed together in series as a battery.

## VALIDITY OF PATENT '927

Between 1912, when the Edison patent first suggested recombination of overcharge gases with one another, and 1947, the year of the French predecessor of the '927 patent application, there were many attempts to produce a safe, practical, simple and useful sealed, secondary cell. All were to no avail, since none could eliminate or control all the gases produced on overcharge. If these gases are evolved and not disposed of within the cell, gas pressure precludes sealing.

The patent at issue, '927,[13] discloses the first practical solution to the disposal of overcharge gases. Broadly speaking, it works like this:

Although the electrolysis of water produced during the overcharge is often referred to as one process, $2H_2O \rightarrow 2H_2 \uparrow + O_2 \uparrow$, in fact it consists of two separate reactions. The anode attracts negatively charged hydroxide ions and the subtraction of electrons there forms water and free oxygen. The cathode attracts positively charged hydronium ions and an addition of electrons yields water and free hydrogen.[14]

Electrolysis occurs only after charging has been completed. If the anode is completely charged, but uncharged material remains on the cathode, the anode electrolysis reaction will occur, liberating oxygen gas. So long as uncharged material remains on the cathode, the cathode hydrolysis reaction will not occur, and no hydrogen will be evolved. If charging continues, and the remaining negative active material becomes, like the anode, fully charged, a further introduction of current will begin to produce the cathode electrolysis reaction, liberating hydrogen. Thus by the existence of an excess of negative uncharged active material, a cell may be produced which liberates oxygen on overcharge, but does not liberate hydrogen until after a lapse of time.

Now, the flow of electric current from a cell is not the only way to discharge an electrode. Oxygen will react with a charged cadmium cathode wetted with electrolyte and *discharge it chemically*.[15] Hydrogen will similarly react to discharge a wetted nickel hydroxide anode, *but at an exceptionally slow rate*. Since hydrogen is evolved at a comparatively high rate, but recombined very slowly, hydrogen pressure will build within the cell.

What '927 does is to combine both these described phenomena. It uses the time lapse between oxygen and hydrogen production on overcharge caused by

12. Silvey, # 524,843.

13. French predecessors to patent '927 were filed December 20, 1947 and February 24, 1948. Patent '927 was filed in United States Patent Office, January 29, 1949.

14. Ionization:
$$\begin{array}{cc} \text{(hydronium)} & \text{(hydroxide)} \\ 8H_2O \rightarrow 4H_3O+ & + 4OH- \end{array}$$

Anode: $4OH- - 4e \rightarrow 2H_2O + O_2 \uparrow$

Cathode: $4H_3O+ + 4e \rightarrow 4H_2O + 2H_2 \uparrow$

15. I. e. depolarize it.

the presence of excess negative capacity together with the discharging recombination reaction of oxygen at the cathode. Current is fed into the cell until the anode is fully charged at which time the cathode is only partially charged. Oxygen is liberated in the cell, slowly building the pressure inside the cell. Still, the cathode is not fully charged, so that no hydrogen is produced. The oxygen is transported to the cathode and begins to react with it and discharge it. As the pressure inside the cell increases, the discharging reaction at the cathode becomes faster and more oxygen is combined there. Finally there comes a point at which all the oxygen which is being produced at the anode is being recombined at the cathode. At the same time, the rate of electrical charging of the cathode caused by the passage of current through the cell is exactly equal to the rate of cathode discharge chemically effected by its reaction with oxygen under pressure.[16] A state of "dynamic equilibrium" has been reached. From that time on, at that pressure, although a constant electric current is passed through the cell, all the oxygen gas produced at the anode is used at the cathode; all the electrical charging at the cathode is discharged chemically. Since at all times excess uncharged capacity is retained in the cathode, it is *never overcharged*, and therefore the hydrogen releasing electrolysis reaction never occurs. Since hydrogen is not produced, its disposition, otherwise so difficult, presents no problem.

The '927 patent includes the design of a separator structure which will (a) provide a mechanism for the transportation of oxygen from the anode to the cathode, (b) keep those portions of the cathode which are being discharged also in contact with the electrolyte so they may become recharged, and (c) function merely as an immobilizer of electrolyte during the normal charge and discharge cycles of the cell. This part of the patent calls for a separator which has passages within it between the electrodes. The passages are designed to remain free of electrolyte to allow oxygen to pass through them. This structure, combined with a film of electrolyte on the surface of the electrodes where the gases contact them, provides for gas transportation, discharge of the electrodes by the gases, and recharging of those portions of the electrodes which have been discharged by the gases.

The invention is claimed in the patent thus:

"1. An electrolytic cell of the type described comprising a sealed vessel capable of confining under pressure the gases generated therein, and in said vessel a negative electrode, a positive electrode, an immobilized liquid electrolyte between limited areas of the surface of one electrode and the surface of the other electrode, free gas passages through electrolyte-free gas spaces between other areas of opposite surfaces of said electrodes, and a film of the electrolyte on said latter areas, said latter film-covered areas on either electrode causing thereon depolarization and recombination of a substantial amount of the gas developed at the electrode of the opposite polarity.

"2. An electrolytic cell as defined in claim 1 wherein the amount of active material in the negative electrode is in substantial excess of the equivalent amount of active material in the positive electrode.

"3. An electrolytic cell of the type described comprising a sealed vessel capable of confining under pressure the gases generated therein and in said vessel a negative electrode, a positive electrode, a separator of electrically non-conductive

16. Thus, two equilibriums are reached at the same time to establish total equilibrium in the cell. Oxygen produced at the anode equals oxygen recombined at the cathode; electrical rate of charge equals chemical rate of discharge.

material between, and in contact with, said electrodes, a liquid electrolyte absorbed by said separator, electrolyte-free gas passages between the electrodes defined by said separator, and a film of the electrolyte covering the openings of said passages in the surface of the electrodes, the film-covered area of the surface of each electrode causing thereon depolarization and recombination of a substantial amount of the gas developed at the electrode of the opposite polarity."

Defendant asserts that the patent in issue is not valid since it teaches nothing new to the art; it is not inventive; shows no inventive genius; is obvious to a skilled craftsman in light of the prior art; and is directly anticipated by that art. For purposes of proof, he analyzes the patent in its component parts. This is instructive. We will do the same, treating the components in the order in which they are described by claims 1 and 2 of the patent.

*"An electrolytic cell of the type described * * *."* I. e. an alkaline cell constructed with cadmium cathode, nickel hydroxide anode and aqueous potassium hydroxide electrolyte. This was a standard chemical construction in the art.

*"* * * a sealed vessel * * *."* As stated above, sealed cells were known to the art at least as early as the Edison patent in 1912. The idea of sealing was not new. A sealed cell which maintained its structural integrity during overcharge was novel; but this is merely a definition of the aim of the patent and not its method of achieving it.

*"* * * capable of confining under pressure the gases generated therein * * *."* The '927 invention uses pressure to maximize the important cathode oxygen reaction and is necessary to establish equilibrium in the cell. Ruben patent #2,422,045 (1947) was apparently capable of withstanding internal pressure. Related patent Ruben #2,462,998 (1949), a primary cell, was specifically so designed. The concept of making the cell a pressure container was not new, but neither was it the usual practice.[17]

*"* * * and in said vessel* [electrodes and] *an immobilized liquid electrolyte * * *."* To one skilled in this art, as we have noted, this means a porous, non-conductive separator in which the electrolyte is absorbed. Such separators were known to the prior art, made of, for example, asbestos,[18] nylon or polyamide,[19] and polyvinal chloride.[20] Immobilization by means of a porous separator is not novel.[21]

*"* * * [the electrolyte is] between limited areas of the surface of one electrode and the surface of the other electrode, free gas passages through electrolyte free gas spaces between other areas of opposite surfaces of said electrodes * * *."* This is new. In the prior art separators were used to immobilize the electrolyte and not to provide the mechanism for transport of evolved gases. In order to minimize internal resistance it was customary to saturate them in order that the maximum amount of electrolyte be present between the electrodes during production of electricity. For '927 though, the inventors wanted free gas passages to facilitate oxygen transport on overcharge. They can be provided

---

17. As pressure increases, the danger of explosion is similarly increased. The normal teaching of the prior art, where gas pressure was not used for reactions in the cell, was to build weaknesses into the cell so that gas escaped or the cell ruptured before explosion occurred. Thus usual practice in the art was contrary rather than anticipatory to the teaching of '927.

18. E.g. Junger British Patent No. 7,892 (1890).

19. E.g. Milnes British Patent No. 593,643 (1947).

20. E.g. French Publication L'Importance Des Matieres Plastiques en Electrotechnique (1947).

21. Also see Silvey, #524,843 (1894).

for in at least two ways: (1) Using a partially saturated, porous, capillary [22] separator, new to the art in that prior separators were usually fully saturated; or (2) using a separator composed of capillary and non-capillary passages,[23] not previously employed in the making of batteries.

Defendant argues that this device is anticipated. First, he says, all separators, unless manufactured with laboratory precision, will have some pores with gas remaining. Secondly, he asserts that the normal method of design requires the construction of test cells filled with varying amounts of electrolyte, and that this technique assures that some cells will have unsaturated separators with consequent gas free passages. Nonetheless, the use of a separator purposely manufactured to have electrolyte free passages interspersed with full ones is new, instructive, and unanticipated.

"* * * and a film of the electrolyte on said latter area * * *." The use of film on electrodes was known to the prior art. Three kinds of electrodes are used in the art. The pocket-type electrode has the active material contained in a metallic mesh envelope or pocket; the tubular-type electrode has active material contained in a perforated tube; the sintered-type electrode has the active material impregnated into a metallic support. All three were known previous to '927 and two of them, the pocket and sintered types, were known to achieve an electrolyte film when dipped into the liquid electrolyte. It is true that the presence of the '927 separator might add to the thickness of the film on the electrodes, but the use of an electrolytic film on the electrodes was not in itself new.

"* * * causing thereon * * *[*] recombination of a substantial amount of the gas developed at the electrode of the opposite polarity." The recombination reaction and the necessity of the presence of electrolyte for it were recognized long before patent '927.[24]

"[T]he amount of active material in the negative electrode is in substantial excess of the equivalent amount of active material in the positive." In the open-cell art, it was customary to provide for an excess negative capacity. The reason was to make allowance for the greater speed with which the cathode aged. The aging was caused in large measure by the presence and chemical activity of carbon dioxide, $CO_2$, from the air. Since there is an absence of air in a sealed cell, there is no carbon dioxide. Oxygen, or a mixture of oxygen and hydrogen, are the only gases present in quantity. Apparently, for purposes of resisting aging, excess negative capacity in a sealed cell was no longer needed. Still, in fact, sealed cells might well have been constructed with excess negative capacity. Not before the present patent had the negative active material in the cathode been used for the purpose of suppressing hydrogen during overcharge.

Defendant claims, however, that Rublee patent #2,269,040, directly anticipates the use of excess negative capacity for the purpose of suppression. That patent is for an acid secondary cell with a lead peroxide anode and a copper cathode. The cell is sealed but it allows gas leakage. The specifications call for a "metal that is below hydrogen in the electromotive series"[25] and say that copper is best suited. In this cell the cathode in the charged state is the metallic copper and in the discharged state the

22. For our purposes, capillarity can be understood as the ability of a pore, in this case in the separator, to capture and retain liquid, in this case electrolyte, in which it has been dipped.

23. Thus, the capillary holes retain electrolyte, the non-capillary holes do not and therefore constitute the electrolyte free gas passages.

24. Lange et al., #2,131,592 (1938), identical with A.F.A. German patent #674,829 (1939).

25. We note, from a chart included in the '669 file wrapper, that cadmium is not below hydrogen in the electromotive series, but we do not in any way base our holding upon this fact.

copper ions in the acidic electrolyte. The Rublee specifications describe how hydrogen is suppressed.

"On charging the cell of the present invention, the solution pressure of copper being lower than that of hydrogen, the copper ions travel to the copper electrode, absorb the surplus electrons and become metallic copper which then plates on the electrode. As the charge nears completion, the concentration of copper ions in solution would become quite low, with the result that some hydrogen ions would also begin to travel to the copper electrode, causing liberation of gas. To eliminate this I provide a surplus of copper ions. On overcharge, the gas formation at the copper electrode is still eliminated by this surplus of copper ions. At the lead dioxide electrode oxygen is liberated. This reacts with the copper electrode at the surface of the electrolyte, the sulfuric acid acting as a catalyst. The copper oxide then reacts with the sulfuric acid, forming copper sulfate and water. Thus there is no liberation of gas during an overcharge."[26]

Once the surplus of copper ions is exhausted, hydrogen will be generated. There is no provision in the patent for the generation of more copper ions.[27] Therefore, unlike the '927 cell, if the cell continues to overcharge, hydrogen will be generated eventually.

■ Defendant's position, nonetheless, is that claim 2 of '927 calls for excess uncharged negative capacity, just as the Rublee patent uses excess negative capacity of the copper ions. Differences in the method of operation, the form of the excess capacity,[28] and ability to tolerate continued overcharge are all substantial. We do not find similarities sufficient to show anticipation. Moreover, defendant has failed to demonstrate that it would have been obvious to one skilled in the art, in light of the Rublee patent, to use excess cadmium hydroxide in a nickel-cadmium cell for the purpose given by the '927 patent. Thus only in barest principle does Rublee foreshadow '927. This is not enough for a finding of anticipation.

The use of excess capacity to prevent the overcharge of an electrode is disclosed in Tichenor patent #2,578,027, granted December 11, 1951, on an application filed March 15, 1948, which is some ten months prior to the filing date of '927. The Tichenor specifications state:

"On the other hand, if prevention of overcharge of a predetermined one of the electrodes is to be assured by a wide margin, then that electrode is provided again with a greater electrochemical capacity than is the other but is initially not charged when the battery is sealed, it being again assumed that the other electrode is initially not charged * * *."[29]

■ However, we find the Tichenor patent does not anticipate '927. The '927 patent corresponds in its disclosed subject matter to French patent #1,006,-583, this latter patent having been filed in France on February 4, 1948, as application #549,505. The United States application which resulted in the '927 patent was filed within 12 months thereafter, namely on January 12, 1949. Therefore, we find that the '927 patent is entitled to the effective filing date of

---

26. P. 2, col. 1, lines 44–63.

27. Defendant contends that the oxygen generated at the anode depolarizes the cathode. This may be so. The product of the reaction, however, is copper sulfate which means that the net result is a substance different from the original cathode composition; in '927 the reaction produces a substance identical in composition with the discharged cathode.

28. The excess capacity of Rublee is the excess free copper ions in the electrolyte, whereas '927 requires excess negative material "in the negative electrode."

29. Col. 13, lines 31–38.

February 4, 1948, under the statutes in effect at that time.[30]

Finally, defendant cites Herold patent, British #317,130, claiming that it is also anticipatory. That patent pertains to secondary, alkaline, nickel-cadmium cells as opposed to the sealed cells in suit. The specifications call for excess negative capacity which is incorporated in the cell in the same manner as in '927: through use of excess cadmium in the cathode. But the problem which this invention seeks to solve is overdischarge and not overcharge. Since the cell is not sealed, the excess negative capacity cannot possibly result in hydrogen suppression; the oxygen produced at the anode escapes into the atmosphere rather than discharging the cathode and suppressing the hydrogen-releasing reaction. Moreover, there is evidence that if the Herold device is to work in a sealed cell, a precharge must be put on the cathode.[31] So, although the cathode has excess negative capacity, there is no substantial excess uncharged capacity after a period of overcharging. Once the excess uncharged capacity has become charged, there will be no chemical discharge of the cathode and both hydrogen and oxygen will be released. In short, though Herold approximates the same device as the hydrogen-suppression feature of '927, it would not work in a sealed cell to suppress hydrogen.

We find that excess negative capacity in the cathode is not novel, but that its use as a hydrogen-suppressing feature is.[32]

Thus, of the parts of the invention studied, one is new to the art, the separator structure; and one is a new use of an old practice, the hydrogen-suppression mechanism. The other elements are,

at best, improvements of prior techniques and devices.

■ A great deal of time and effort have been expended on this aspect of the case. The question of the antiquity of certain parts of the invention has been examined in minute detail and argued at length. As we have said, it is important and instructive; however, it is not conclusive. Even if all its elements are old and well known to the prior art, a patent may be valid as a new, inventive and useful combination.[33] The claimed invention is a whole device of many composite parts, and not the many small parts alone. Our attention must be directed towards the patentability of the invention in its entirety, as it is disclosed by '927, and not merely its components.

■■ The most instructive guide for an analysis of the patent's validity is Judge Hand's, in the Safety Car Heating case:

"In appraising an inventor's contribution to the art, as we have often said, the most reliable test is to look at the situation before and after it appears. *Substantially all inventions are for the combination of old elements; what counts is the selection, out of all their possible permutations, of that new combination which will be serviceable.* No objective standard is practicable; * * * [citing cases] as, for example, whether each of the elements operates in a different way from what it did in other combinations. That is almost never true of a machine; each member ordinarily performs the same mechanical function which it does in any other machine;

---

30. See Rev.Stat. § 4887 (1875), as amended.

31. We will discuss this in greater detail in connection with plaintiff's '058 patent below.

32. See our discussion of claim 6, plaintiff's patent '058, below, discussing validity of the patenting of the hydrogen-suppression structure alone.

33. Bliss v. Gotham Industries, Inc., 316 F.2d 848 (9th Cir. 1963); Minneapolis-Honeywell Regulator Co. v. Midwestern Instruments, Inc., 298 F.2d 36 (7th Cir. 1961); Safety Car Heating & Lighting Co. v. General Electric Co., 155 F.2d 937 (2d Cir. 1946).

it is their cooperation that produces the result, and the value of that cooperation depends upon the sagacity which divined the end and fabricated the means. Courts, made up of laymen as they must be, are likely either to underrate, or to overrate, the difficulties in making new and profitable discoveries in fields with which they cannot be familiar; and, so far as it is available, they had best appraise the originality involved by the circumstances which preceded, attended and succeeded the appearance of the invention. * * *" (Emphasis supplied.) [34]

Prior to 1947, there was a 35-year history of attempts to recombine overcharge gases in an effort to produce a safe, efficient, inexpensive, practical and useful sealed secondary cell. The previous thrusts by inventors were not totally fruitless, this reflected by the large number of patents granted in the art before 1947; but neither were they wholly successful. It is a plain fact that there were no commercially practical sealed secondary cells before patent '927.

■ The creators of the patent were skilled in the art and with all probability knew of the techniques, processes and devices which had been developed. From this established technology they picked and chose. The prior art used an electrolytic film on anode and cathode, but used it rarely. Electrolyte was immobilized, but as often it was free. Excess negative capacity was used, but its use was not taught for sealed cells or for overcharge gas control. The technique of recombination was known, but allowing the escape of excess gas instead was prevalent. The art was unclear and ambiguous. It taught many contradictory processes and approaches. From it, the inventors had to pick the elements which would allow the implementation of their scheme for safe, efficient overcharge. To this they added a novel structure, the separator with electrolyte-free gas passages. And by a careful selection from the old, and addition of the new when required, the inventors solved the key problem in the field; they prevented excessive gas pressure in a sealed cell during overcharge. They provided for a device which allowed manufacture of a sealed secondary cell that worked, practically, safely, and at reasonable cost. We find this to be genius and invention of the highest order.[35] It is not detracted from one whit by the fact that some of the component features were already known.

Although evidence on industry reception of the patent in question is somewhat sketchy, it reflects the invention, usefulness and importance of '927. The practitioners of the art showed an immediate and sustained interest in the commercial and technical potential of the invention.

Today, cells in the family of the first workable '927 cell are distributed throughout the world to perform an infinite variety of electrical functions in every conceivable environment. The '927 patent remains the outstanding invention in a most sophisticated and useful art and the turning point in its commercial success. It is fruitless to claim its anticipation, obviousness or lack of invention or genius.

We agree with the approach of the Fifth Circuit in a similar [36] case:

"We think the basic fallacy of * * * [defendant's] position as to lack of invention in * * * [the patent] lies in their attempt to show anticipation by separating the entire combination into its component elements and, in the light of hindsight, to expose them piecemeal as

34. 155 F.2d at 939.

35. Southern Phosphate Corp. v. Phosphate Recovery Corp., 102 F.2d 791 (3d Cir. 1939); National Lock Washer Co., v. George K. Garrett Co., Inc., 98 F.2d 643 (3d Cir. 1938); Phila. & Reading Coal and Iron Co. v. D., L. & W. Coal Co., 88 F.2d 391 (3d Cir. 1937).

36. Legally but not technologically similar.

already known to the * * * art. * * * The * * * patent may not here be invalidated under the tests for invention laid down in the A. & P. Tea Co. case [Great A & P Tea Co., v. Supermarket Equipment Corporation, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950)], * * * since that case involved only uniting old elements 'with no change in their respective functions,' whereas the patent here involved combines both old and new elements to produce a new result." [37]

In rebuttal, defendant has introduced several series of test cells, some allegedly made according to Monnot, British patent #214,799 (1924) and some allegedly according to Nife, British patent #561,-820 (1944). These patents were part of the prior art and defendant, following their specifications, was able to construct cells which were sealed and which overcharged without undue internal pressure. We find, however, that they were built according to those patents in combination with the teachings of the art after '927 and the teachings of '927 itself.[38] We find further that at best this establishes that Monnot and Nife were not contradictory to '927 and thus the later teachings could make them operate successfully. However, we find that if someone skilled in the art as it was before the teachings of '927 sought to build a cell according to Monnot or Nife, sealed it, and commenced overcharge, gases would be produced, would accumulate, would cause continuing pressure increase

and result in leakage, rupture or explosion.

"It is not sufficient to constitute an anticipation that the device relied upon might by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor actually used, for the performance of such functions." [39]

■ Defendant insists that even if the device is patentable, the patent is invalid since it is drawn too broadly and does not teach enough about the device to be enforceable. We disagree.

■ The requirement that the claims of a patent be definite " * * * serves two primary purposes: those skilled in the art must be able to understand and apply the teachings of the invention and enterprise and experimentation must not be discouraged by the creation of an area of uncertainty as to the scope of the invention." [40]

■ We think it clear that one skilled in the art who examines the patent will know what is claimed by the patent and can construct a workable, sealed secondary cell according to it. Thus, the tests have been met. The patentees have defined their invention as precisely as can be expected considering the subject matter of the patent. This is all the law requires.[41]

We conclude that claim 2 of patent '927, as it incorporates claim 1 by reference, is valid.

37. Jeoffroy Mfg., Inc. v. Graham, 206 F. 2d 772, 776–777 (5th Cir. 1953). Cf. Union Carbide & Carbon Corp. v. Stuart Laboratories, Inc., 194 F.2d 823, 826 (3d Cir. 1952): "Upon looking back after a discovery is made, it is usually not difficult to find possible analogies in the prior art, for it is axiomatic that progress is always step by step. In applying the standard of patentable invention, our task is to draw the line between the tiny step forward and the large stride. This invention, we feel, is a significant stride forward."

38. E.g. Sealing, electrolyte-free gas passages, or use of excess negative capacity.

39. Topliff v. Topliff, 145 U.S. 156, 161, 12 S.Ct. 825, 828, 36 L.Ed. 658 (1892).

40. Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 136 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958).

41. Ibid.

However, claims 1 and 3 present a difficult and disturbing problem. They do not claim the whole of '927, but claim the invention without the hydrogen suppression structure. The latter is found only in claim 2. The question presented is whether said partial claims are valid.

Claims 1 and 3 teach the making of a sealed cell substantially the same as that outlined in our discussion of claim 2. Since the hydrogen suppression structure is omitted, however, in order for the cell described to work, the gases must be dealt with in some other way. We have seen that in such a cell only a minute volume of the hydrogen evolved would be disposed of, this by recombination at the anode. If the recharging current were fed into the cell at a trickle, the hydrogen might recombine in sufficient quantities to allow overcharge. Such a cell would charge far too slowly to be useful. On the other hand, if an ordinary flow of electricity were used in charging a claim 1 or claim 3 cell, the hydrogen evolved would escape or cause the cell to rupture or explode. So, no successful alternative to hydrogen suppression is presented by either claim.

If the prior art taught the use of excess negative capacity in the cathode's active material, and anyone skilled in the art would have known that in building the cell such excess should be used, the claim 2 would only make explicit what is implicit in the art; it would be an unnecessary appendage to claim 1. One and 3 would be understood by those of ordinary skill to include excess negative capacity, and would thus describe the complete patent and be valid in the iden-

tical way that we have found claim 2 valid.[42] To the contrary, we have found that while the art used excess negative capacity in the cathode, it was not so generally practiced that a craftsman would have understood claims 1 and 3 to include it. Claims 1 and 3 do not by implication include the teaching of excess negative capacity. Reading these claims, seeing that no carbon dioxide was present and no excess capacity called for, and knowing nothing of the technique of hydrogen suppression, he would be likely to build the cell with equal active charged material in both electrodes; a cell which would not overcharge safely.

 We have concluded that the genius and invention of '927 is its solution of the problem of gas evolution on overcharge. But without the excess negative capacity called for in claim 2, that problem is not solved. Claims 1 and 3 teach only the novel construction of batteries which will leak, rupture or explode in use. We cannot consider this an advance in the art. It does not represent a "significant stride forward."[43] We do not believe that a part of a legitimate invention, teaching nothing useful in itself, is properly claimed.[44]

 Claim 4 of patent '927 is for: "An electrolytic cell as defined in claim 3 wherein the separator is a porous fabric made of synthetic polyamide fibers."

Claim 3 has been found invalid since it does not provide a successful overcharge gas control device. Claim 4, by adding a separator of polyamide fibers does not cure claim 3's deficiency. A cell built according to claim 4 will, like a

---

42. Analogously, claims 1 and 2 do not specify that the separator be non-conductive. But anyone skilled in the art would know that a cell cannot work with a conductive separator. He would build a '927 cell accordingly.

43. Union Carbide & Carbon Corp. v. Stuart Laboratories, Inc., supra note 37.

44. The invention is not so frivolous and lacking in utility as to be void on the

ground of lack of utility, alone. 35 U.S.C. § 101; 1 Deller's Walker on Patents, pp. 312–313 (1937); Application of Nelson and Shabica, 280 F.2d 172, 47 C.C.P.A. (Patents) 1031 (1960). Rather, we believe that the lack of utility reflects on the lack of inventiveness of claims 1 and 3. Just as claim 2 is inventive and ingenious because it solves a difficult problem, claims 1 and 3 are not inventive because they are of so little value. See cases cited, supra note 35.

claim 3 cell, fail to control overcharge gases and therefore leak, rupture or explode during extended overcharging.

Moreover, the use of polyamide fibers in a claim 3 device is not itself so novel, inventive and useful as to be patentable. It is, at best, a particularly efficient embodiment of claim 3's unpatentable invention.

Claim 4 is invalid for lack of invention.

■■■ We are fully aware that the limited monopoly allowed to an inventor by patent cuts across the grain of our legally protected system of free enterprise. The entrepreneur's freedom to produce and distribute what he will in search of profit is limited by the scope of a patent monopoly granted to another. So, it is the duty of this court to subject an invention to careful scrutiny before enforcing the inventor's right to the patent monopoly. Claim 2 of patent '927, providing as it does an ingenious device for the solution of a major technical problem, is without doubt worthy of the monopoly. The invention's magnitude requires that the patent law protect it, encouraging both future invention and future disclosure to the art.

Claims 1 and 3 seek to broaden the monopoly by further limiting the elements on which it is based. Claim 4 is a mere variation of claim 3. We find that since these claims do not constitute a useful advance in technology, such an extension of the '927 patent monopoly is not warranted and ought not to be enforced by this court.

## INFRINGEMENT OF PATENT '927

We have found that claim 2 of patent '927 is valid as a combination of elements which together constitute a patentable device for the control of overcharge gases. We must now decide whether the cells sold by defendant infringe that claim.

■■■ The Fourth Circuit Court of Appeals stated the applicable test of infringement thus:

"To establish infringement of its combination patent plaintiff must show that every essential element of the combination, or its equivalent, is embodied in the antagonist device. [Citing cases.]" [45]

We understand this to be an accurate reflection of the law.[46]

■■■ It is not necessary under this test that all components be precisely the elements described in the patent claims and specifications. A defendant's product may be held to infringe even though he has replaced one or more of the patent's parts with equivalents.

"Combination patents would generally be valueless in the absence of a right to equivalents, for few combinations now exist, or can hereafter be made, which do not contain at least one element, an efficient substitute for which could readily be suggested by any person skilled in the particular art." [47]

A component is deemed "equivalent" if it does the same job as the patent's component in substantially the same way.[48]

It is no simple matter to determine how defendant's cells are made and how they work. The fact that they can operate only if hermetically sealed makes precise findings on certain operations extremely difficult. This court is nevertheless thoroughly satisfied [49] that the

45. Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670, 677 (4th Cir. 1961). See Q-Tips, Inc. v. Johnson & Johnson, 207 F.2d 509 (3d Cir. 1953).

46. See 3 Deller's Walker on Patents, 1728–1730 (1937).

47. Id. at page 1701, citing Thrall v. Poole, 89 F. 718, 721 (C.C.N.D.Ill.1898).

48. Machine Company v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935 (1877). Test reiterated in Sanitary Refrigerator Company v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147 (1929).

49. There was little controversy concerning these first seven findings.

accused sells upon which evidence was adduced have the following attributes:

1. They are sealed and have casings which are gas tight and capable of confining evolved gases under pressure.

2. They are nickel-cadmium cells. Specifically, the anodes are porous sintered plates containing nickel hydroxide, bivalent in the discharged state and trivalent in the charged state, as the active positive material. The cathodes are porous sintered plates containing cadmium hydroxide in the discharged state and cadmium in the charged state as the active negative material.

3. They contain a liquid alkaline electrolyte, specifically an aqueous solution of potassium hydroxide.

4. They can be subject to prolonged overcharging without damage to the casings or other adverse effects. During overcharge, gas pressure exists within the cells. The pressure stabilizes at an equilibrium value and is due to the presence of almost pure oxygen. Under this equilibrium condition, oxygen is recombined at the same rate at which it is formed.

5. They evolve no hydrogen when overcharged. The suppression of hydrogen in the cell is accomplished through the use of a substantial excess negative capacity in the cathode.

6. They have a film of electrolyte on all parts of the electrode surfaces which are exposed to gases.

7. They contain a limited quantity of electrolyte held immobile in the pores of the electrodes and separators.

A comparison of these components with claims 1 and 2 of '927 set out above [50] establishes that the accused cells contain all the elements of the patent except for the emphasized portions of the following which describe the patent structure for transferring oxygen between electrodes:

"CLAIM 1: * * * [A]n immobilized liquid electrolyte between *limited areas* of the surface of one electrode and the surface of the other electrode, *free gas passages through electrolyte-free gas spaces between other areas of opposite surfaces of said electrodes* * * *."

A major controversy encountered throughout the litigation of this case concerns the existence and nature of these "free gas passages" or "electrolyte-free spaces" in defendant's cells. After examining the evidence we are convinced that neither party has conclusively established the fact of their existence or absence. Yet, since for infringement all the patent's components or their equivalents must be found in defendant's product, the issue of infringement turns on the character of the oxygen transport device.

A layman is prone to think that all problems which may be submitted to scientific analysis are capable of being answered clearly, definitely and certainly. This is not the case. The scientist operates in a world of possibilities and probabilities as do the rest of us. In determining the mechanics of oxygen transfer in the cells we expect a definite, correct and sure appraisal which cannot be given. The experts can weigh the probabilities and make educated guesses concerning the presence and nature of electrolyte free passages at overcharge but until some method of "getting into the cell and observing" is found, we are left with the legal standards of proof: more probable than not; "a preponderance of the believable evidence." [51]

There are four different theories which have been offered as possible explanations for the occurrence of the essential process of gas transfer in defendant's cells. The oxygen might be conveyed from anode to cathode (#1) around the

---

50. At page 616.

51. See McCormick on Evidence, § 319, pp. 676–679 (1954).

separator, (#2) through the separator while dissolved in the electrolyte, (#3) through electrolyte free passages in the separator which exist throughout the operation of the cell, or (#4) through gas passages created by oxygen displacing electrolyte in pores of the separator. All methods account for some of the transfer. The pertinent question is which method or methods are indispensible to the operation and may be described as the main vehicle for gas transport.

In the accused cells, transfer around the separator (#1) or while dissolved in electrolyte (#2) accounts for only a small portion of the process. These mechanisms cannot carry sufficient volumes of gas to accomplish the transportation of the quantity of oxygen which must be conveyed from anode to cathode for the pressure control device to work.

Plaintiff has insisted that transfer is accomplished through the third method, electrolyte free spaces existing throughout the operation of the cell. He has failed to establish that the passages exist at the crucial time of overcharge or that they are in fact the vehicle for oxygen transfer. His experiments were deficient in that they did not consider the variability of the volume of electrolyte in the cell at different phases of operation. On the contrary, the evidence indicates that the inter-electrode passages are virtually filled with electrolyte at the time overcharge commences. Conversely, at that time the number of separator pores forming gas passages is apparently extremely small. It is therefore improbable that permanent gas passages existing at all times during cell operation (#3) accomplish the bulk of the necessary gas transfer.

Experiments made or reported at trial lead us to the conclusion that oxygen displacement of electrolyte, forming gas passages in the overcharging cell, would successfully transfer the required amount of gas between the electrodes. This, when combined with our finding that other suggested methods of transport cannot account for the successful operation of the cells, convinces us that the operation of those cells is best explained by the displacement theory of oxygen transfer (#4).

 While to this extent we agree with defendant's view of the facts, it does not follow that his cells therefore do not infringe the patent. The patent covers gas transfer through passages that exist throughout cell operation (#3). It does not teach transfer as we find it to occur in the accused cells: through passages made by gas displacement of electrolyte (#4).[52] We find, however, that there is no material difference between the patent's cell which transports gas through permanent passages and defendant's cell which transports gas through passages formed by the gases themselves. The only difference in structure is that in the patent the passages are built into the separator whereas in defendant's cells they are created at overcharge. The only possible difference in effect is that defendant's cells are slightly less efficient than the patent's during overcharge and slightly more efficient during discharge. The variance is minimal.[53] The comparable separator structures perform identical functions in substantially the same way and with virtually the same results. The gas transfer system employed by defendant is an equivalent

---

52. Plaintiff agrees that the patent only teaches transfer through passages present at the time of sealing.

53. Even if a substituted part performs its function better than the corresponding patent part thus constituting an improvement, this does not negate its status as an equivalent. 3 Deller's Walker on Pat-

ents 1691–1693, 1743–1744 (1937) citing Atlantic Giant Powder Co. v. Mowbray, Fed.Cas.No.624 (1876). Also see Highway Appliances Co. v. American Concrete Expansion Joint Co., 93 F.2d 113, 118 (7th Cir. 1937) *holding* that improvement of an equivalent in the light of advances in technology since the patent does not avoid infringement.

of the patent's.[54] To hold otherwise would be to unduly and unwisely restrict the scope of monopoly protection given to plaintiff by the patent; to withhold from him the "rightful fruits of his invention." [55]

 We find that a comparison of claim 2 of patent '927 and defendant's cells discloses that every element found in the patent or its equivalent is used by defendant to achieve a like result.[56] The defendant's cells therefore infringe the patent.[56A]

## VALIDITY OF PATENT '058: CLAIMS 2 AND 9

The cells in suit have a maximum voltage in the vicinity of 1.3 or 1.4 volts when fully charged. After discharge beyond a certain point the voltage is steadily reduced. The voltage of these cells is sufficient for practical or commercial use only while it remains above 0.9 or 1.0. When it drops below this value the cell enters what may be termed the "deep-discharge mode." Current is still produced but not with enough force to be useful. A single cell in a circuit will continue to discharge through the deep-discharge mode and eventually reach zero voltage, where positive and negative electrodes are of equal potential. The flow of current will then come to a stop.

If an outside source of current is applied to this fully discharged cell in the same direction as in discharge,[57] the cell will "overdischarge" and obtain a negative voltage. A cell in this state is said to be "reversed" or "inverted."

Because of a lack of precision in production techniques, the several cells in a battery do not have exactly the same capacity. And it is characteristic of them to have a very short deep-discharge period. Soon after they stop producing useful voltage, the voltage reaches zero, the brink of inversion. When the cells are connected in series within a battery, one will go into the deep-discharge mode and reach zero voltage while others are still producing a useful current. And since the cells are connected in series, the higher voltage cells push electricity through the expended lower voltage cells. The lower voltage cells are driven by this current beyond zero voltage and into inversion.

There are two basic dangers inherent in cell inversion. First, harmful oxides may be formed on the cathode. This factor was disregarded by the parties; hence, we shall not dwell on it. Second, and more important, electric current produced in an inverted cell will electrolyze the electrolyte. The process and its results are similar to the electrolysis which occurs on overcharge. Since the current is flowing in a direction opposite to overcharge, however, the gases are formed at opposite electrodes: oxygen at the cathode and hydrogen at the anode. The significance of the electrolysis is that inversion will thereby produce pressure within a cell which can pose a serious obstacle to proper and safe operation.

In an operating alkaline cell like those here in suit, the inversion process is complicated by an additional factor. The

54. Machine Company v. Murphy; Sanitary Refrigerator Company v. Winters, supra, note 48.
 We think that as a pioneer patent, claim 2 of '927 qualifies for a liberal interpretation of equivalents under the doctrine that a patent which "has effected * * * [a major] advance in the art * * * is entitled to liberal treatment and protection by a liberal application of the doctrine of equivalents. * * * [Citing cases.]" Hartford-Empire Co. v. Swindell Bros., 96 F.2d 227, 230 (4th Cir. 1938), cert. denied, 306 U.S. 634, 59 S.Ct. 464, 83 L.Ed. 1035 (1939). But we find defendant's gas transfer device to be

equivalent even under the most rigorous definition.

55. Del Francia v. Stanthony Corporation, 278 F.2d 745, 749 (9th Cir. 1960).

56. Entron of Maryland, Inc. v. Jerrold Electronics Corp., supra, note 45.

56A. See the recent case of Marvel Specialty Co. v. Bell Hosiery Hills, Inc., 330 F.2d 164 (4th Cir. 1964) for a strikingly similar approach to patent validity and infringement.

57. Compare recharging, where the current is applied in the direction opposite to discharge.

anode and cathode do not approach the inversion point at a constant rate.[58] In these cells, the cathode maintains its level of potential throughout discharge and then suddenly drops. In cells of this kind the cathode voltage drop occurs as the cell's voltage passes through the one-volt area, which is also the period of the beginning of deep discharge. Simultaneously, the anode slopes gently toward the one-volt mark and, similar to the cathode, there begins a sharp drop. But then, due in large measure to an obscure reaction involving anodic graphite, the anode's discharge is temporarily stopped.[59] When this reaction is completed, the anode then resumes its sharp drop in charge.[60]

58. The following diagrams, Figures 1 and 2 of patent '058 specifications, should be helpful in understanding the discharge patterns of these cells. We find that they properly represent the discharge curves of sealed cells of the type described without the plaintiff's invention (Figure 1) and with the invention (Figure 2). Curve 1 (C, D, G, A, B) represents the positive electrode's discharge curve; curve 2 (E, F, G) the negative electrode's. Curve 3 is the overall cell voltage, or the difference between the potentiality of positive and negative electrodes (curve 1 minus curve 2). G, where positive and negative electrode curves cross, is the point of inversion. A-B is the "anodic graphite" reaction plateau described herein. The vertical axis is voltage; the horizontal is time or capacity.

59. This is the plateau A-B of Figures 1 and 2 of patent '058. The reaction and anodic plateau were known as least as early as 1928. Herold British Patent # 317,130.

60. The anodic plateau has an incidental effect on cell operation which ought to be noted. No hydrogen-producing electrolytic reaction takes place while that reaction is happening, regardless of whether or when the inversion occurs. Thus, in '058 Figures 1 and 2, while the production of oxygen begins at "G", inversion point, considerable hydrogen evolution is delayed until after the end, "B", of the anodic plateau. This phenomenon has given rise to several inventions seeking to control inversion gases by recombining oxygen alone while preventing overdischarge beyond point "B" and thus suppressing hydrogen evolution.

The invention promulgated by '058 patent, claims 2 and 9, seeks to avoid or at least minimize the dangers of inversion gassing by extension of the deep-discharge period. These claims read:

"2. A gastight storage cell which comprises a sealed vessel, a positive electrode in said vessel, a negative electrode in said vessel in a state of charge higher than that of said positive electrode and having a higher capacity than said positive electrode, and an electrolyte in contact with both of said electrodes.

"* * *

"9. A gastight storage battery cell which comprises a sealed vessel capable of confining under pressure the gases generated therein, and in said vessel an alkaline electrolyte, a positive electrode containing in the active mass nickel oxide which is oxidized to a higher oxidation degree on charging, and a negative electrode containing the oxide of a metal selected from the group consisting of iron and cadmium, which oxide is reduced to the metal on charging, said negative electrode having a higher capacity than the positive electrode and the amount of metal on the negative electrode exceeding at any time substantially the electrically equivalent proportion of higher oxidized nickel oxide simultaneously present in the active mass of the positive electrode."

The inventor explained his invention in the specifications thus:

"According to my invention, the risks resulting from overdischarge in the case of slight unequalities [sic] in the amp.-hr. capacities of gas tight cells connected in series are obviated by giving the negative electrode of each cell a capacity higher than that of its positive electrode and by closing the gastight vessel of each of these cells, when they are being manufactured, only when the two electrodes thereof have been brought to such a state of oxidizing or charging that the negative electrode is charged to a higher degree than the positive electrode ["excess state of charge"], the difference of charge between the two electrodes being however at most equal to the difference between their capacities.

"In other words, according to my invention, when the positive electrode of a gastight storage cell is fully oxidized, and therefore fully charged, the amount of oxidizable metal then present on the negative electrode corresponds, for this electrode, to a possibility of discharge higher than that of the positive electrode."[61]

Inversion takes place when the positive electrode potential becomes less than the negative electrode potential, signified in the '058 diagrams by the crossing of the lines representing the charge of the two electrodes. The central idea of plaintiff's patent is to build a cell retaining the normal anode structure but extending the cathode's discharge. The character of the discharge curves is such that the cell will enter deep-discharge mode at the same time it would ordinarily. But by retaining extra charge in the cathode, its drop in potential, and consequent inversion, is delayed until after the anodic plateau, "A–B."[62] The net effect is to have a cell in which there is deep discharge for a considerable period of time, rather than the extremely brief period in the cell without such a structure. The patented method for lengthening of the deep-discharge period insures that all cells in a battery are in deep discharge and the battery as a whole is useless, before any single cell is inverted. A battery user, seeing his battery no longer "works," will normally remove it from circuit, and thus halt discharge and commence recharge, before inversion of any cell occurs, with its consequent hazards.

61. Patent '058, Col. 1, line 55—Col. 2, line 20.

62. See patent '058, Figure 2, supra, note 58.

Defendant bases his assertion that claims 2 and 9 are invalid on two major grounds. First, he says that the patent does not in fact provide an answer to the problem of inversion gases; that it is invalid because not successful. The assertion turns on the allegation that the '058 claims are not an improvement since gas generation is merely delayed and not prevented. Moreover, when gassing does occur both oxygen and hydrogen are produced, whereas in the ordinary cell, initially only oxygen is produced during inversion. Disposing of oxygen in the pre-patent cell is relatively easy and can be done at other stages of the charge-discharge cycle. But it is virtually impossible to eliminate hydrogen evolved in a cell constructed according to the patent.

The attack misses the thrust of the invention. The purpose of '058 is to extend the time between entry into deep discharge and inversion so that batteries with cells ready to invert will produce no useful voltage and be removed from circuit. It does not seek to eliminate inversion. The aim is accomplished. Such a cell will allow for the production of a battery which, with careful use, will minimize the dangers of inversion. The patent, contrary to defendant's allegation, does provide adequate protection for the cell.

Defendant's second attack on the patent's validity alleges that '058 is not inventive since it is anticipated by the prior art. He cites for this proposition the Tichenor and Herold patents.

Herold British Patent # 317,130 was cited by the Patent Office in their initial rejection of claim 2. The inventor sought to have the examiner reconsider that decision. The argument he used to persuade the examiner that claim 2 of '058 was patentable, over and above Herold, is instructive. He said:

> "Fig. 4 of Herold has a certain resemblance to Fig. 2 of the application; however, the present invention is not predicated on such a curve but on the means to realize such curves in a gas tight accumulator."

His argument was based primarily on the fact that the Herold patent is for an open cell. Excess charge on the negative electrode of such a cell can be obtained simply by allowing excess capacity in the negative electrode. On overcharge of such a cell, both electrodes become fully charged, resulting in an excess state of charge in the cathode. But Herold's method will not work in a sealed cell as described in '058 since the cathode does not at any time become fully charged. It will not obtain a negative charge substantially in excess of that of the anode when positive and negative electrodes are equally charged at the commencement of the charging operation. Plaintiff's application reflected this argument:

> "The invention is based on the recognition of the fact that the charge and discharge conditions of sealed accumulators differ from the conditions of open accumulators, and that the state of charge of the electrodes [in a sealed cell] at the end of the charge is determined not only by the capacity of the electrodes and the duration of the charge but in addition by the initial state of charge of the electrodes at the start of the charging operation. This third condition, which is characteristic for the invention, is not mentioned by Herold, which is not surprising as Herold does not consider sealed accumulators."

Continuing, the applicant said:

> "[T]he invention consists, therefore, in providing that at the moment of sealing the gas tight accumulator, the negative electrode which has a greater capacity than the positive electrode, has also a *greater quantity of active mass in the charged state* than the positive electrode, whereby the difference in the charged masses present in sealing * * * may be, at most, equal to the difference in the capacities

of the two electrodes." (Emphasis supplied.)

Apparently, the Patent Office agreed, for subsequently claims 2 and 9 were allowed. We are in accord. The basic idea behind claims 2 and 9, an excess negative state of charge, was introduced by Herold. But the anticipation by the earlier patent does not render the '058 claims invalid since Herold provides neither excess negative charge before sealing on the negative electrode nor any alternative method for accomplishing excess negative charge in a sealed cell.

■ Defendant does not rely on Herold alone, however. He claims that Tichenor patent # 2,578,027, filed on March 15, 1948, was part of the art previous to the excess state of charge feature of '058, filed in 1950, and was anticipatory.[63] The Tichenor patent discloses a rechargeable cell having (a) a hermetically sealed case, (b) positive and negative "main" electrodes, (c) a filling of free-flowing electrolyte which floods the cell, (d) an auxiliary electrode, (e) a heated catalyst for combusting oxygen and hydrogen gases, (f) a voltage source for supplying different voltages to the auxiliary electrode, and (g) pressure sensitive diaphragm switches for supplying different voltages to the auxiliary electrode when the internal gas pressure reaches various values. In operation, the auxiliary electrode assures that both hydrogen and oxygen are evolved in the proper proportion so that they can be recombined into water. Unless the auxiliary electrode is employed for this purpose, the cell will not work. The Tichenor cell is a veritable "Rube Goldberg" contraption; it is difficult to imagine making it more complex. An expert testified that it is so complicated that it is neither practical nor safe unless used in a remote place where faulty operation would produce no danger to life and limb.

Defendant's argument is directed not to the overall operation of Tichenor but to the feature described in the following specification statement:

"[I]f prevention of a complete discharge of a predetermined one of the electrodes is to be assured by a wide margin, that electrode is provided with a greater electrochemical capacity than is the other and is also initially partially charged when the battery is sealed, it being assumed that the other electrode is initially not charged. * * * Of course, this other electrode may be initially partially or fully charged so long as the desired differential in the charge capabilities of the electrodes is obtained when the battery is sealed." [64]

The words of the Tichenor specifications thus quoted anticipate all the elements of claims 2 and 9. But it is not necessary to determine whether Tichenor, by itself, anticipated the claims. Herold provided for excess negative charge. Tichenor put the excess charge on the electrode before sealing so that the device would work in a sealed cell. The single aspect of the '058 claims found by the Patent Office and this court to be missing from the Herold patent was provided by the Tichenor patent.

■ We find that Herold and Tichenor taken together fully anticipate claims 2 and 9 of '058. Those claims are therefore invalid.

### VALIDITY OF PATENT '058: CLAIM 6

Claim 6 reads:

"A gastight storage cell of the character described comprising a sealed vessel capable of confining under pressure the gases generated therein, and in said vessel a positive electrode and a negative electrode, said negative electrode having a

63. There is no presumption of validity of the '058 patent with respect to anticipation by Tichenor since the latter was not cited by the Patent Office in allowing the patent. B. F. Goodrich Co. v. United States Rubber Co., 244 F.2d 468, 470 (4th Cir. 1957); O'Leary v. Liggett Drug Co., 150 F.2d 656, 664 (6th Cir. 1945).

64. Col. 13, lines 24–31, 38–42.

higher capacity than said positive electrode and the oxidation states of said two electrodes being so adjusted that the capacity of the negative electrode to accumulate electric energy under the influence of a charging current is higher than that of the positive electrode."

Thus claim 6 is for the hydrogen-suppression structure set forth in claim 2 of patent '927, discussed in detail above. In '927, the whole overcharge gas control device is protected. This later [65] patent seeks to protect the suppression structure alone.

Defendant's initial attack on claim 6 is that it constitutes an illegal "double patenting." He argues that plaintiff cannot first patent a complicated device which includes a simple structure and thereafter patent the simple structure alone.

■ There is indeed no inventive difference between the hydrogen-suppression structure of claim 2, '927, and claim 6, '058. Both claims are for but one invention and "there is no statutory provision for the granting of a plurality of patents on a single invention * * *."[66]

In Pierce v. Allen B. Du Mont Laboratories, Inc., the Third Circuit had occasion to formulate standards of patentability for such a second patent:

"[T]he Pierce oscillator is the only new and inventive feature of the combination patent '496 [the prior patent]. Moreover, the Pierce oscillator performs no different function and achieves no significantly different result in this combination than when used in any other circuit. * * * [Therefore the second patent is invalid.]" [67]

This can be restated in terms of the instant case:

The hydrogen-suppression structure is the only new and inventive feature of claim 2 of '927. Moreover, the hydrogen-suppression structure performs no different function and achieves no significantly different result in this combination than when used in any other cell. Therefore patent '058, claim 6, is invalid.

■ There are circumstances peculiar to this case, however, which suggest a result contrary to that in Pierce. Patent '927 as a whole has joint patentees whereas hydrogen suppression *per se* as it appears in '058 has a sole inventor. The hydrogen suppression of claim 6 could not stand alone as a claim in the former joint patent for that reason.[68] The only way for the individual inventor Neumann to protect his invention was by the separate patent which he obtained. The Pierce opinion reflects a strong policy against unnecessary extension of patent monopoly through the granting of multiple patents. But the second patent here is not "unnecessary." [69] We are therefore of the opinion that claim 6 is not an instance of invalid double patenting.[70]

65. On January 29, 1949, Neumann and Gottesmann filed an application which resulted in the '927 patent and included as a part of the invention the hydrogen-suppression structure. On November 18, 1950, Neumann alone filed this application which resulted in the '058 patent. This application included, in a May 17, 1951 amendment, claim 6, for the hydrogen-suppression structure. Neumann stated on oath that he was the sole inventor of everything contained in the application, implying that he alone invented the hydrogen-suppression structure but that he and Gottesmann invented the combination of this with the remainder of the '927 structure.

66. Application of Ockert, 245 F.2d 467, 469, 44 C.C.P.A. (Patents) 1024 (1957).

67. 297 F.2d 323, 328 (3d Cir. 1961), cert. denied 371 U.S. 814, 83 S.Ct. 24, 9 L.Ed. 2d 55 (1962).

68. In re Hamilton, 38 F.2d 889, 17 C.C.P. A. (Patents) 914 (1930).

69. A similar result was reached by the Patent Office Board of Appeal in Ex parte Brogden, 3 U.S.P.Q. 129 (1929).

70. Our holding in connection with prior art, below, makes a more detailed examination of the law of double patenting unnecessary.

Defendant further asserts that excess negative capacity has always been used in the art and the fact that plaintiff has discovered a new use or property in excess cathode material does not constitute patentable invention. Unless this is so, he says, it would be possible to build a cell which is entirely in accordance with the teachings of the prior art but which would run afoul of plaintiff's patent monopoly.

In examining the hydrogen-suppression structure in connection with patent '927 we found that it is common in the art of producing secondary cells to provide for excess negative capacity. In open cells this is done to retard aging or corrosion of the negative electrode. In a sealed cell there is no excessive aging of this type, and thus no apparent reason for continuing the use of excess negative capacity. Yet, in fact and as a matter of course, excess negative capacity may often be used.

█ This court concludes that one skilled in the art would consider the use of excess negative capacity, even without the teachings of this patent. Neumann discovered a new function for excess negative capacity, but a new use for an old device, no matter how clever, is not patentable.

> " '[T]he application of an old process to a new and analogous purpose does not involve invention, even if the new result had not before been contemplated.' * * * [Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U.S. 11, 18, 12 S.Ct. 601, 36 L.Ed. 327 (1892).] * * * Where there has been use of an article or where the method of its manufacture is known, more than a new advantage of the prod-

uct must be discovered in order to claim invention." [73]

█ We find that claim 6 is not "inventive" within the narrow meaning of that term in the patent laws. It is therefore not valid.

### VALIDITY OF PATENT '058: CLAIM 5

Claim 5 reads:

> "A gastight storage cell according to claim 2 in which the difference of charge between between [sic] the electrodes is smaller than the difference between their capacities."

██ It is a combination of the elements of claims 2 and 6. We have found that those claims are not inventive and are therefore invalid. The mere combination of these two devices is no more than the sum of its parts; a combination of uses which might ordinarily be employed by anyone skilled in that art. Such an aggregation of non-inventive elements which is obvious and performs no new or different function or operation does not involve patentable invention.[72] It follows that claim 5 is invalid for lack of invention.

We have discussed only those issues in this lengthy and complicated suit which merit detailed consideration. We find claims 1, 3 and 4, Patent Number 2,571,927, and claims 2, 5, 6 and 9, Patent Number 2,636,058, to be invalid. We find claim 2 of Patent Number 2,571,927 to be valid and infringed by defendant Gulton's cells VO .250, VO .500, VO 1.-750, VO D, VO 4D and VO 9.

█ An accounting for damages under 35 U.S.C. § 284 pursuant to this opinion will await the conclusion of appellate review or the expiration of the time for taking an appeal, if none is

---

71. General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 247-249, 66 S.Ct. 81, 90 L.Ed. 43 (1945).

72. Detrola Radio & Television Corp. v. Hazeltine Corp., 313 U.S. 259, 61 S.Ct.

948, 85 L.Ed. 1319 (1941); Packwood v. Briggs & Stratton Corp., 195 F.2d 971 (3d Cir.1952); Zephyr American Corp. v. Bates Mfg. Co., 128 F.2d 380 (3d Cir. 1942).

taken.[73] We will enjoin and restrain defendant Gulton from further infringement of claim 2, Patent Number 2,571,-927. 35 U.S.C. § 283.

A form of order in accordance with this opinion is to be submitted.

---

73. 28 U.S.C. § 1292 (1958): *"Interlocutory decisions*
"(a) The courts of appeals shall have jurisdiction of appeals from:

"\* \* \*
"(4) Judgments in civil actions for patent infringement which are final except for accounting."