**J. L. CLARK MANUFACTURING CO.,**
Plaintiff,

v.

**AMERICAN CAN COMPANY,**
Defendant.

Civ. No. 711–64.

United States District Court
D. New Jersey.
March 30, 1966.

Toner, Crowley, Woelper & Vanderbilt, Newark, N. J. (Willard G. Woelper, Newark, N. J.) for plaintiff, Wolfe, Hubbard, Voit & Osann, Chicago, Ill. (Richard Russell Wolfe, Edward B. Holt, and Thomas M. Small, Chicago, Ill., appearing).

Pitney, Hardin & Kipp, Newark, N. J. (Frank C. O'Brien, Newark, N. J.) for

defendant, Davis, Hoxie, Faithfull & Hapgood, New York City (John Hoxie, Stanley Amberg, George P. Ziehmer, and James W. Fitzsimmons, New York City, appearing).

## OPINION

LANE, District Judge:

This is an action for infringement of United States Letters Patent Number 3,129,860 (hereinafter "Foster patent"). Said patent, entitled "Closure Construction for Sifting Containers," was issued to plaintiff J. L. Clark Manufacturing Co. on April 21, 1964, upon an application of John A. Foster, plaintiff's assignor. The original application for the patent in suit was filed November 23, 1960,[1] and application was refiled as a continuation-in-part on November 14, 1962.[2]

Plaintiff is a corporation organized and existing under the laws of the State of Illinois, its principal place of business being located in Rockford, Illinois. Defendant American Can Company is a New Jersey corporation. This court has jurisdiction of the subject matter of and parties to this suit pursuant to federal patent law.[3]

Plaintiff seeks injunctive relief to prevent further infringement of the Foster patent,[4] damages for past infringement, costs, and attorneys fees.[5] Defendant asserts that its competitive product does not infringe, and that the Foster patent is invalid both for lack of invention and because the very construction shown therein was put "on sale" by plaintiff more than one year before November 23, 1960, the original application date.[6]

The "sifting containers" for which "closure constructions" are designed are the cans of various spices which one finds in grocery stores. These spice cans are constructed in four basic sizes, called 2 oz., 4 oz., 8 oz., and 16 oz., to indicate the size of the can, though the weight of the contents thereof may differ. The two smaller sizes are primarily used in the home, whereas the larger ones are for institutional use. The body, bottom and top of these spice cans are all manufactured separately and later combined into one unit.

The subject of the patent in suit is that part of the spice can top which is called the closure. Whatever their particular design, all spice can closures presented herein have (a) an adjustable member attached to the top of the can or a portion thereof, and (b) a hole or holes both in the can top and the adjustable member which can either be made to register with each other to permit the dispensing of the can's contents or be put out of register in order to prevent dispensing.

Plaintiff and defendant are spice can manufacturers who supply these cans, including their closures, to the large spice companies such as McCormick & Company, Inc., R. T. French Company, C. F. Sauer Company, and Glidden Company. Spice cans are supplied pursuant to contracts which include, among other items, the volume contemplated and the price per so many units volume.

Until the early 1960's spice can closures were made completely of metal, although some patents suggested that the moving part could be plastic.[7] Previously available plastics, although non-corrosive and more attractive, were both expensive and unable to withstand the attack of spice oils.

Typical examples of all-metal closures are those used with the cans introduced by plaintiff as Exhibits P–11 and P–12. Both cans were made by defendant, the major producer of spice cans employing such closures. In the closure incorporated in P–11, a flat sheet metal part,

1. Ser. No. 71,268.

2. Ser. No. 242,032.

3. 35 U.S.C. §§ 271, 281 (1964) and 28 U.S.C. §§ 1338(a), 1400 (1964).

4. 35 U.S.C. § 283 (1964).

5. 35 U.S.C. §§ 284, 285 (1964).

6. 35 U.S.C. § 102(b) (1964).

7. Parkin #2,159,978 (1939), Schlabach #2,780,395 (1957), Wigert #2,791,359 (1957), Ankney #2,961,133 (1960).

722

commonly called a dredge, is mounted on top of the can in such a way as to slide back and forth on that top surface in which a hole is punched by the user. In one position of the dredge, the hole is covered, closing the can. When the dredge is slid to a second position, small sifter holes therein become aligned with the hole in the can top so that the spice may be sifted out. In a third position the hole in the top is uncovered to permit the spice to be poured or spooned out.

In the closure of can P–12, a round metal disk is mounted to rotate on the top of the can. This disk is held in place by collapsing part of the top panel in such a way that an overhanging lip surrounds the entire edge of the disk. A hole is punched in that part of the can top which is underneath the wheel. In one position the disk covers the hole and closes the can. When turned to a second position, sifter holes in the disk are over the top's hole. In a third position a large hole in the disk coincides with the hole in the can top.[8]

The all-metal closures had several disadvantages. The sheet metal was subject to corrosion, making a can leaky and unsightly. The finger ribs in the metal dredge or disk tended to chip the housewife's fingernails, especially if the closure did not function smoothly. All indications were that an improved closure, if not too expensive, would be well received by the spice industry and the public.

Until it developed the Foster patent's closure, plaintiff manufactured a very small proportion of the cans used by the spice companies. In an effort to expand its spice can business, plaintiff assigned to Foster, an engineer in its employ, the task of designing a new closure. By May of 1959 Foster had designed the closure which plaintiff later adopted for its 8 oz. and 16 oz. size cans. Plaintiff's sales personnel actively solicited customers.

Laboratory tests determined that linear polyethylene (a plastic just then available in commercial quantities) was an acceptable material for the moving part of the closure because it did not react with chemicals in the spices.

Claim 1 of plaintiff's (Foster) patent is typical of the several claims therein and describes:

1. A sifter top for a dispensing container comprising a rigid sheet metal top wall defining an annular rigid dome having a top surface of pronounced convex curvature and a hole therethrough offset laterally from the axis of the dome, an upright wall larger than said dome and surrounding the latter to form an annular upwardly opening intervening groove below the periphery of the dome, a disk of resiliently yieldable plastic larger than and lying against the top of said dome and molded to an initial curvature less than that of said dome surface, and means formed out of said upright wall and overlying the edge of said disk to bend the overhanging margin thereof downwardly to and against the peripheral edge of said dome and hold the disk in tight face to face contact with said dome surface while permitting turning of the disk about its axis, said disk having a perforation thereon adapted to register with said hole in one angular position of said dome and to be covered by the latter in other positions.

The essential elements of this product are:

(1) the use of plastic for the disk;

(2) a domed surface in the can top on which the plastic disk rests and is held in "face to face contact";

(3) "an upwardly opening annular groove" around the edge of the dome's surface which makes the domed area smaller in radius than the plastic disk so that the latter "overhangs" the groove.

8. The closures of P–11 and P–12 are the subject of Letters Patent Number 2,183,585 issued to defendant, the assignee of John F. Peters, on December 19, 1939.

For 8 oz. and 16 oz. cans the closure is a removable plug inserted in a hole in the can top. In the 2 oz. and 4 oz. cans the closure is an integral part of the can top panel.

The events subsequent to the appearance of the Foster closure indicate that J. L. Clark literally captured the market in spice cans. P–10, a file entitled "Summary of Plaintiff's Sales," discloses the following information about the rise of Clark's percentage of the market attributable to that innovation:

(1) from 26.4% to 80.7% in the 16 oz. size (1959–1964);

(2) from 13.2% to 81.1% in the 8 oz. size (1960–1964);

(3) from 2.5% to 33.6% in the 4 oz. size (1962–1964);

(4) from 0.6% to 19.2% in the 2 oz. size (1963–1964).

In the years 1960 through 1963, Glidden, McCormick, R. T. French and C. F. Sauer all began to order plaintiff's cans with the new plastic-on-metal closure. These spice companies felt that the attractiveness and improved sealing qualities of this closure more than compensated for the increased cost involved.

As soon as plaintiff commenced marketing 8 oz. and 16 oz. cans incorporating the new plastic-on-metal closure, defendant began losing its customers for cans of those sizes. From January 1960 through March 1961 defendant tried unsuccessfully to design a closure that could compete with plaintiff's. Many alternative designs were proposed to the spice companies but to no avail. In February and March 1961 defendant tried to purchase plug closures from plaintiff to incorporate in the cans supplied to customers still purchasing from defendant. Plaintiff refused to sell to defendant, and the latter soon abandoned its efforts to compete in the 8 oz. and 16 oz. fields.

By November 1961 defendant learned that plaintiff had adapted the new clo-sure to fit the 4 oz. can. Defendant's engineers again tried unsuccessfully to develop plastic-on-metal closures different in design from that of plaintiff. By March 1962, McCormick, the largest spice company, had changed from defendant to plaintiff as the source of its 4 oz. cans. In 1963 plaintiff was on the verge of capturing another American Can customer: R. T. French Company. In September of that year, French, after awarding its 4 oz. business to plaintiff, recanted and decided to stay with defendant. This decision resulted from defendant's promise to provide a "Clark-type"[9] closure accompanied by a special patent indemnity.[10]

Defendant subsequently supplied a plastic-on-metal closure for 4 oz. cans to French, later developed a variation thereof for 2 oz. cans, and advertised its product in magazines of national circulation.[11] It is these closures for 2 oz. and 4 oz. cans which plaintiff alleges infringe the Foster patent.

### Infringement

Plaintiff contends that defendant's new closure directly infringes the Foster patent because the patent's claims are an accurate, exact description of that closure. As indicated above, the plastic disk, the domed floor of the cup that holds the disk, and the "groove" surrounding the periphery of the dome are the basic components of those claims.

Defendant does not deny that its disk is made out of a brightly-colored plastic nor that its cup floor is domed. Admittedly, the purpose of these two features is to achieve a tight face-to-face contact between the cup floor and the disk by collapsing the side walls of the cup over the disk and pressing it down onto the cup floor with pressure sufficient to force the resilient plastic to conform to the shape of that domed floor. Both parties employ this wall collapse technique to take advantage of the plastic disk and the domed floor.

9. P–35B.

10. P–40.

11. P–9.

The "groove" provided for in the Foster patent is imparted to plaintiff's closures through the use of a domed die or anvil which itself has a groove around the periphery. This groove in the die face produces a groove in the domed metal cup floor at the time the stamping process of plaintiff's tooling imparts the shape of that die to the metal. Defendant's dies have no such groove, and whatever groove does occur at the edge of the domed metal floor of defendant's new closure is produced by pressures on the metal which result from the collapse of the cup's side walls to secure the disk.

It is in regard to the "groove" feature that defendant denies infringement, asserting: (1) that defendant's new closure has no groove, only random occasional distortions that result from the manufacturing process and the vagaries of the metal of certain tops; and (2) that defendant's closure, if it has a groove, does not have the groove provided for in the Foster patent because the groove of defendant's closure is not imparted to the domed floor by dies used in the metal stamping process but rather results from distortion of the metal during wall collapse.

The evidence bearing on the presence or absence of a *recurring* groove in defendant's new closure is essentially (a) the testimony of plaintiff's witness Rich supplemented by slides and photocopies thereof introduced as P–30–11 through 30–27;[12] (b) the testimony of plaintiff's witness Ekstrom, a master mechanic who visited defendant's Brooklyn plant, inspected the dies and the manufacturing processes there, and took samples off the current production run; (c) a chart P–39 prepared by Ekstrom showing the progressive steps in the process of manufacturing defendant's new closure; (d) the testimony of defendant's witness Leonard La Croce supplemented by photographs of defendant's new closure introduced as D–20–1 through 20–12.

Rich's testimony regarding defendant's product and the photographs P–30–11 through 30–27 show a pronounced change in curvature of the dome at a point near its edge, which change in curvature is sometimes accompanied by an overhang of the disk in that area. On other occasions the disk has been pinched down so tightly that it takes the shape of this area of changed curvature. This change in curvature recurs regularly rather than randomly or occasionally throughout these photographs.

Ekstrom's testimony and the chart P–39 with which he illustrated his remarks also indicate that the change in curvature, the "groove" of defendant's new closure, is a recurring feature. On cross-examination Ekstrom testified:

Q Do you agree, Mr. Ekstrom, that this change of curvature of the bottom wall of the cup, which you depict in Figures 9–A, 9–B and 9–C, does not occur in every instance, collapsing the sidewall?

A My best answer for that, Mr. Hoxie, would be that when viewing the lines at the American Can plant and seeing the parts come off of the tooling there in production, all of the parts that I saw revealed this condition of this upward movement of the metal that you have just been referring to. [Tr. 257.]

Defendant's witness La Croce testified that such alterations in curvature sometimes did and sometimes did not occur. On at least two occasions he indicated that certain photos forming a part of D–20[13] showed no change in curvature. An examination of these two pictures (D–20–2–A–1 and D–20–2–B–1) and others submitted indicates at least a slight curvature change.

A study of the evidence leads this court to the conclusion that defendant's new top regularly contains a change in curvature, or groove, in the domed metal surface near its edge. Therefore, we

12. These pictures are of cross-sections of a closure severed along its vertical axis.

13. Cross-sections showing the same view as P–30–11 through 30–27.

turn to the question of whether or not the presence of such a groove constitutes infringement.

The purpose of the groove provided for in plaintiff's (Foster) patent is to permit the use in the closures of plastic disks whose thicknesses vary due to the imprecision of mass production. For example, a disk which is unusually thick will be partially absorbed by the groove, when the collapse of the sidewall unites the closure's parts, and thus will turn freely rather than bind. As indicated above, plaintiff's tools impart the groove to the metal floor at a manufacturing stage which precedes the wall collapse. Later, during the collapsing operation, the anvil upon which the metal floor piece rests also has a groove around its edge to receive the groove previously formed. Ostensibly, no change in the groove occurs during the wall collapse operations.

Ekstrom, on direct examination by plaintiff, proceeded to describe the various steps in the formation of *defendant's* new closure, using the chart P–39 to illustrate his remarks. In step number 5, a dome shape is imparted to the metal floor by means of stamping the metal on a domed die. In the ninth operation a domed anvil receives the pre-domed metal, and the side walls of the cup are collapsed to secure the disk. P–39 clearly shows that both the die of the fifth step and the anvil of the ninth have domes of uniform curvature across their entire surfaces. These tools do not have the groove which Ekstrom acknowledged was present in the comparable tools of plaintiff. Ekstrom next described the occurrences depicted in parts 9a, 9b, and 9c of P–39. He stated that the corner piece is harder than the rest of the metal of the dome because that corner was previously "cold-worked * * * to the point where it takes a set." Tr. 223.

Ekstrom continued:

Q With that cold-working and hardening of the corner of the cup, what happens in this collapsing operation?

A Well, this corner is increased in hardness in the previous operations by being formed so sharply that, as the downward pressure of the collapsing operation is applied, as it moves, as is indicated between 9–A and 9–B, it moves some metal inwardly toward the center of the dome area, and this has its effect on the shape of the dome, as is indicated in 9–B. And subsequently, in 9–C, this process continues to the point where there is a definite change in the dome of the part. [Tr. 223–224.]

He concluded that the "change in the dome" occurring in defendant's manufacturing process does produce a groove:

Q What change in shape does ultimately take place in the bottom of the cup in that ninth operation?

A As the ninth operation progresses to its completion, and there is this slight movement of metal around this corner, as is illustrated in 9–A, 9–B, and 9–C, the metal is flowing inwardly toward the center of the whole area. It increases the depth of the dome and forms what we have been referring to in its various variations, different variations as a groove. [Tr. 225.]

Ekstrom acknowledged that the "main objective" of defendant's ninth operation was to unite the disk and the metal cup; that a comparison of cross sections before and after the ninth step was the basis of his "mind-eye view of what happens" in the corner region as depicted in 9a, 9b and 9c; and that the groove was formed because the portion of the metal dome next to the hardened corner was bowed-up away from the anvil, not because the dome's edge settled into a groove at the edge of the die.

In evaluating the above evidence, defendant makes the following statements in its post-trial brief, asserting that its groove is not the groove of the Foster patent:

In the Canco closure, there is no pre-formed groove in the bottom wall of the cup. There is nothing to form

one. Plaintiff's witness who examined defendant's dies agreed that there is no groove in the die face that forms the cup's bottom wall at the fifth operation, none in the corresponding die face at the ninth operation, and nothing in the intervening operations 6 to 8 to form a groove in the cup's bottom.

It therefore is plain indeed that defendant does not use the substance of the Foster idea of doming less than the whole area of the cup's bottom wall, of pre-forming a groove in the bottom wall surrounding that domed area, and of using a rotor of greater diameter than the dome in order to assure contact of the rotor with the dome over the entire domed area, despite variations in the size of the rotor part. The Canco closure therefore does not have what the Foster patent describes as its overhang and groove.

This court reaches a different conclusion, however. The evidence indicates that the two closures, however produced, are virtually identical in the crucial groove area. Foster did not patent a process for producing spice can closures. Nor did he patent the dies to be used in such a process. Each of the claims of the patent indicates that "a sifter top for a dispensing container" (a product not a process) is the subject of the patent.

The evidence shows that defendant's groove *is* in net effect the groove provided for in the Foster patent. Therefore, defendant may not avoid liability on the ground that the groove of its closure is different. If the patent is valid, only plaintiff is allowed to make the spice can top specifically described. The evidence here shows that defendant's top in its final form fits the patent specifications. That this form is reached by means of tooling different from plaintiff's is irrelevant because the patent makes no reference to tooling, only to the end product. Only if the patent is invalid may defendant manufacture its present plastic-on-metal closure without being liable for infringement.

### Validity

█ Defendant also contends that plaintiff's (Foster) patent is invalid for lack of invention. To be valid, a patent must contain the necessary inventiveness in either of two ways: firstly, the patent must include one or more brand new components or aspects which are patentable; or secondly, "if all its elements are old and well known to the prior art, a patent [must be] a new, inventive and useful combination." Gould-National Batteries, Inc. v. Gulton Industries, Inc., 231 F.Supp. 609, 620 (D.C.N.J.1964) and cases cited therein.

As previously indicated, the claims of the Foster patent call for "a disk of resiliently yieldable plastic" as the moving member of the spice can closure. Neither the use of the "disk" nor the use of "plastic" for it was novel at the time John Foster applied for his patent. Among the eight items of prior art introduced in evidence by defendant, the Peters [14], Truesbury [15], Wigert [16], Ankney [17], Erb [18], and Drummond [19], patents all suggest a rotating disk as the primary or alternative form for the moving member; and the use of some type of plastic for this member is mentioned in the Parkin [20], Schlabach [21], Wigert, and Ankney patents, the last two specifically referring to polyethylene as a possibility.

The following reasons for the use of plastic are set out in the Schlabach patent and were read into the record by defendant's counsel:

> With a view to a savings in material cost and in the manufacture of closure bars it is suggested that a plastic material be used which adapts

14. #2,183,585 (1939).

15. #1,877,372 (1932).

16. #2,791,359 (1957).

17. #2,961,133 (1960).

18. #2,664,229 (1953).

19. #2,833,452 (1958).

20. #2,159,978 (1939).

21. #2,780,395 (1957).

readily to the required pretensioning and which may be easily and inexpensively worked to enable formation of the finger grips and plug elements thereon.

There are still further advantages in and compelling reasons for the use of plastic in the manufacture of the closure bars illustrated as a dominant feature of the instant invention. Initially, it is important to note that plastic, when formed in a pretensioned configuration, such as is required for the closure bar elements herein, will retain its resiliency and flexibility under extensive use far better and longer than will metallic elements of a similar size and configuration. Additionally, plastic has a lubricated characteristic which is not found in metals which is advantageous when present in an element designed for frictional rotation relative to another element of plastic or metallic makeup.

Still a further and most important advantage inherent in the use of plastic as the closure element for containers for chemicals which form acid or strong alkaline solutions in the presence of water or moisture lies in the fact that the plastic closure element is not prone to react to the action of such chemicals to effect a corrosive freezing of the closure in its respective dispensing opening. Such freezing of metallic closures in their respective openings is a common and most undesirable occurrence.[22]

The Ankney patent explicitly states:

Closure member 23 is a disk-like, thin, plastic body preferably of polyethylene or similar composition which is both corrosion resistant and of superior wearing qualities as well as flexible and resilient to a substantial degree.[23]

Thus we see that the advantages of using an appropriate plastic were well known in the spice can trade several years before Mr. Foster's application.

The use of plastic and of a disk form were contemplated in prior patents. No new patentable device is present in the plastic disk member claimed by Foster.

Nor is the "annular rigid dome having a top surface of pronounced convex curvature" a novel, patentable feature. The Truesbury patent indicates such a dome shape in the surface underneath the rotary disk. The concept of taking two surfaces of different curvature and binding them together under stress in order to achieve a tight fit between them is not new to the spice can closure field. On cross examination of Mr. Foster, the patentee, the following colloquy took place:

Q  Before any time that you would relate to this patent as the date of invention, in other words, Mr. Foster, you had known about this idea of the differential curvature between two flat pieces that are to be brought into mating contract?

A  Yes.  As a matter of fact, we had experimented with this ourselves in another form prior to it.

Q  Yes.  It was an idea that was abroad in the can-making world was it not?

A  I found out since that it was. At that time I was not aware of it.

In line with Mr. Foster's observations, it should be noted that the Parkin, Truesbury, Schlabach and Ankney patents all indicate this stress-mating technique. In Truesbury, Schlabach, and Ankney, however, the rotary disk is of a *greater* degree of curvature than the surface on which it rests. This disk is bowed up in the center before assembly. It is then anchored by the use of a center axle which pulls that bowed portion down into contact with the under surface, thus pressing the edges of the disk which had previously been resting on the surface even more firmly against it. This process might be called the converse of that employed by Foster. In his patent, the centers touch and the edges of the disk

22.  Schlabach, col. 6, lines 18–46; Tr. 300–301.

23.  Ankney, col. 3, lines 62–66;  Tr. 307.

are pulled down against the under surface by collapsing the side walls. In the Truesbury closure, which has a domed under surface, the rotary disk is domed more and anchored in the center, not flat and journaled at the edge.

The creation of a dome in the cup floor is not new; nor is the purpose for which the Foster patent's dome is created: the stress-mating of two surfaces. Although the disk of the Foster patent has a lesser rather than a greater degree of curvature than the metal top on which it rests, such an alteration is hardly inventive, when the result achieved (the tight contact because of the differences in curvature) is one well known in the prior art. The new arrangement adopted by Foster is reminiscent of the design changes of Letters Patent No. 2,627,798 (Graham) which amounted to inverting the positions of "the shank and the hinge plate" in spring clamps for chisel plows. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). In that case, the Supreme Court, speaking through Mr. Justice Clark, held that such alterations did not produce a patentable invention. In the language of the Court:

> Certainly a person having ordinary skill in the prior art, given the fact that the flex in the shank could be utilized more effectively if allowed to run the entire length of the shank, would immediately see that the thing to do was what Graham did * * *. Ibid.

In the case at bar, the flat-disk, domed-floor feature which Foster adopted was the result of his familiarity with the prior art and his skill as a mechanical engineer, not the product of any inventive genius.

In varying language of virtually uniform meaning, claims 1, 3, 4, and 5 of the Foster patent speak of "means" to secure the plastic rotor to the under surface "in tight face to face contact." Since the disk is originally flat, and the under surface domed, such "means" must necessarily be a collapse of the side wall surrounding the closure member "and overlying the edge of said disk to bend

the overhanging margin thereof downwardly to and against the peripheral edge of said dome." Such a collapse of the side wall, be it of the removable cup in the 8 oz. and 16 oz. sizes or of part of the can top itself in the 2 oz. and 4 oz. sizes is not a novel technique. The Peters, Erb and Drummond patents all provide for this method of securing the two pieces of the closure. D–21, a collection of cross-sectional pictures of defendant's old metal-on-metal closures, shows the wall-collapse process as actually effected in mass production. Therefore, this process was not an original, patentable idea on the date of Foster's application.

The "groove" is the sole aspect of the Foster patent that remains for consideration. Defendant in alleging lack of inventiveness asserts at page 21 of his post-trial brief:

> What plaintiff relies upon to show the presence of an overhang and groove in the accused Canco closure is nothing other than what is inherent in the closure of the Peters patent of 1939. The Foster patent therefore would be invalid if it were so expanded as to embrace something that is old and free to all. The Peters patent has expired; and its subject, thereby put in the public domain, can not be withdrawn from that area of freedom by any later patent. Scott Paper Co. v. Marcalus [Mfg. Co.], 326 U.S. 249, at 256–257 [66 S.Ct. 101, 90 L.Ed. 47] (1945).

In *Scott*, the second "patent" was a copy of the expired patent. The Supreme Court observed that the very purpose of the patent laws was to provide for public disclosure of inventions in consideration for a monopoly of limited duration. A result of this scheme is that "upon the expiration of the patent the public [is] left free to use the invention." 326 U.S. 249, 255, 66 S.Ct. 101, 104. The court held that the second "patent" was ineffective "to deprive the public of the benefits of the free use of the invention" of the expired patent,

and was therefore invalid. Id. at 256, 66 S.Ct. at 104.

The evidence in the present case indicates that defendant's old metal-on-metal top was manufactured pursuant to the Peters patent. The evidence also shows that tops manufactured under Peters had a collapsed retaining wall that produced a change in curvature, at the edge of the flat (not domed) piece under the disk, comparable to the groove of the Foster patent. The photographs of defendant's old closure show the groove achieved. Ekstrom admitted that a groove could be produced by collapsing the wall of a Peters-type closure, but hastened to add that the groove would be greater with a domed floor.

Plaintiff's (Foster) patent is not a copy of Peters. Foster specified the presence of dome, plastic, and groove, none of which was provided for in Peters; although the latter did specify wall collapse as the means of securing the disk. Nor is defendant's new top a product solely of the Peters patent, for this top too has a domed floor and a plastic disk. Defendant, in manufacturing its new top, does employ, however, the wall collapse technique of Peters, a technique that may be freely used. Thus, Foster, the new "patentee" could not patent the wall collapse technique, and it necessarily follows that he may not patent the natural result of the use of that technique, i. e. the groove. To allow a contrary result would be to defeat the policy expressed in *Scott:* "upon the expiration of the patent the public [is] left free to *use* the invention." Id. at 255, 66 S.Ct. at 104, emphasis added.

To supplement its arguments revolving around the *Scott* case defendant adds that in any event the formation of a groove in the old metal-on-metal closures manufactured pursuant to the Peters patent's wall collapse technique constitutes anticipation in the prior art of the groove which Foster sought to

patent. Evidence previously discussed [24] shows that a groove is the inherent result of the manufacture of closures pursuant to the Peters patent. This groove is indistinguishable from that found in plaintiff's new closure. Therefore, the groove feature which Foster provided for was not his invention.

Thus it is evident that none of the particular aspects of the Foster patent were patentable at the time he filed application. This court must, therefore, declare said patent invalid unless it provides for such a "new, inventive and useful combination" [25] of known elements as to be patentable for that reason.

In *Gould,* supra, there is a discussion of useful guidelines for decision on the "new * * * combination" issue:

The claimed invention is a whole device of many composite parts, and not the many small parts alone. Our attention must be directed towards the patentability of the invention in its entirety, as it is disclosed * * * and not merely its components.

The most instructive guide for an analysis of the patent's validity is *Judge Hand's,* in the Safety Car Heating case:

"In appraising an inventor's contribution to the art, as we have often said, the most reliable test is to look at the situation before and after it appears. *Substantially all inventions are for the combination of old elements; what counts is the selection, out of all their possible permutations, of that new combination which would be serviceable.* No objective standard is practicable; * * * [citing cases] as, for example, whether each of the elements operates in a different way from what it did in other combinations. That is almost never true of a machine; each member ordinarily performs the same mechanical function

---

24. D–21.

25. Gould-National Batteries, Inc. v. Gulton Industries, Inc., 231 F.Supp. 609, 620.

which it does in any other machine; it is their cooperation that produces the result, and the value of that cooperation depends upon the sagacity which divined the end and fabricated the means. Courts, made up of laymen as they must be, are likely either to underrate, or to overrate, the difficulties in making new and profitable discoveries in fields with which they cannot be familiar; and, so far as it is available, they had best appraise the originality involved by the circumstances which preceded, attended and succeeded the appearance of the invention. * * * " (Emphasis supplied.) [26]

■ The preceding circumstances to which Judge Hand refers are the prior art discussed above. The prior art reveals that all of the basic elements of the Foster patent were anticipated by previous inventors. The mere combination of these elements into an attractive, workable product does not amount to an invention. Indeed, a combination of old elements into a new physical arrangement will not be patentable if such a new arrangement was obvious to one skilled in the prior art. Graham v. John Deere Co., supra.

■ In order to produce a patentable combination of items already known in the prior art, the prospective patentee must contribute such substantial inventive genius as will constitute the catalyst which makes the new combination possible. The facts of the case at bar indicate no breakthrough to a new combination occasioned by any inventiveness. Moreover, no new function is performed by plaintiff's new closure, and therefore no "sagacity which divined the end" to be achieved by the alleged invention may be attributed to Foster. The Foster closure performs a familiar operation in essentially the same mechanical fashion as its predecessors. The fact that it performs the operation more efficiently does not transfer that well-known operation into the novel product of inventive genius.

■■ John Foster's plastic-on-metal closure is an attractive, useful product but not a patentable invention. Inventive genius made no contribution to the development of this closure; for it served neither as the source of a new, unanticipated component thereof, nor as the catalyst that yielded "a new, inventive and useful combination." Furthermore, the instant commercial success of plaintiff's product does not create the inventive genius lacking here.

### On Sale

Defendant also claims that the Foster patent is invalid for the reason that the product shown therein was put on sale more than one year before his application date: November 23, 1960. While a determination of this issue is not essential, in view of our holding of invalidity for lack of invention, we feel that expression of our decisions on all the issues in the case may facilitate complete disposition on appeal.

The statute upon which this defense is based is 35 U.S.C. § 102(b):

A person shall be entitled to a patent unless * * * (b) the invention was * * * on sale in this country, more than one year prior to the date of the application for patent in the United States * * *.

■ The critical date is November 23, 1959, and there appear to be two essential elements in the proof of "on sale." First, the product offered prior to the one year period must be "the very invention patented, [and] the primary inquiry is one of identity between two things." Chicopee Mfg. Corp. v. Columbus Fiber Mills Co., 165 F.Supp. 307, 323 (M.D.Ga. 1958). Second, the transactions between J. L. Clark and its customers prior to November 23, 1959, must constitute a putting "on sale" of Foster's spice can closure.

The facts relating to the "on sale" defense come from two sources: (1) the

26. Id. at 620, 621.

deposition of Victor Lee Faith, a salesman for J. L. Clark, taken on February 25, 1965, and attached letters from his files, marked D–11c through D–11n; and (2) five documents introduced by plaintiff as Exhibits P–42 through P–46.

The evidence establishes that by May 14, 1959, Foster had designed the spice can closure which he later patented. By mid-August, plaintiff had made overtures to McCormick and Company, Inc., "the Mr. Big spice can user" [27] concerning this closure. Plaintiff's salesmen had shown samples to McCormick, whose representatives indicated they "would like to have prices on this as soon as possible." [28] Faith visited Durkee's Famous Foods, a division of Glidden Company, on September 2 because he "wanted to get [the] new 1–lb. can closure in their hands * * *." [29] Apparently, Durkee's was at that time "very interested in a new closure for this 1–lb. can." [30] A telegram from Victor Faith to one White, employed by J. L. Clark's sales department, dated September 22, 1959, reads: "Durkee's Famous Foods is pushing, is pushing us for new prices on one-pound cans with the round metal and plastic plug." [31] In this same month, plaintiff left a sample of its new closure with C. F. Sauer Company, already one of its spice can customers. Sauer also was favorably impressed.

On October 6th, similar letters (D–11d and D–11k) were written to Durkee and McCormick respectively, to convey "cost information for you on our 1–lb. spice can incorporating a round metal plug with assembled plastic disc." [32]

In his deposition, Faith stated that such a letter was also sent to Sauer. Relevant parts from D–11d read:

> This disc would have sifter holes and a pour spout as illustrated by the sample can already in your possession. However, the pour spout would extend up only as high as the inside depth of the plug. This would enable plugs to be seated by a pressure conveyor * * *. For production and shipment as individual runs, we are pleased to quote: [various prices depending on volume]. Prices are f. o. b. your plant, Bethlehem, Pennsylvania. For each variety change within a production run you would add: [more prices]. We will absorb all art work necessary to reproduce your established designs on our can structure. Because of very substantial tooling and mold expense for the new plug, we would require your assurance of 500,-000 1–lb. cans over a period of time. With extensive tooling involved, which we intend to absorb, we would estimate the first delivery to be available approximately six months after receipt of authorization to proceed.
>
> We have started a testing program in order to determine the type of plastic material necessary to provide a plastic disk which will be impervious to the essential oils in spices. We have been assured that a material will be available to do this job, and we should have conclusive information in the near future.
>
> We are very anxious to have word from you as to the possibility of our supplying you with these containers. If we can provide you with any other information, please contact us.

D–11k, the letter to McCormick, referred to earlier price quotations, and then gave "additional cost involved to be added * * *." References to the testing of plastic, the absorption of tooling costs, the need of a guaranteed first-year volume, and the design of the spout were similar to those in the Durkee letter. In addition, D–11k stated:

> This plug will provide superior dispensing units and at the same time will hold leaking to an absolute minimum. Being a deep plug, it will assure us of a constant and tight fit.
> * * *

---

27. Faith deposition, 2/25/65, p. 32.

28. D–11j.

29. D–11f.

30. Ibid.

31. Faith deposition 2/26/65, p. 31.

32. From D–11d.

Because we are anxious to get going on the plug, we hope that we may have word from you in the near future as to the possibility of our supplying your requirements.

The following colloquy characterizing the above letters took place between Faith and defendant's attorney:

Q   When you made these price quotations I guess it would be fair to say that you sat there hoping that orders would come pouring in.

A   Yes, sir.[33]

Faith visited Durkee's in October 1959 and reported that "things look very promising here regarding the acceptance of our new plug."[34] He suggested that temporary "soft" tools be made to produce "a substantial quantity of good production run cans and plugs,"[35] for use as samples to supplement the hand-made samples already dispensed. A letter of October 23 to Durkee's and comment thereon by Faith in his deposition indicate that Clark quickly proceeded to make such tools and samples.

While plaintiff's salesmen were soliciting the spice companies, its chemists were testing six[36] various plastics to determine which of them were sufficiently resistant to chemical "attack" by spices to be suitable for use as the disk of the new closure. P-44 is a memorandum from C. S. de Neveau of J. L. Clark's laboratory to Foster, dated November 2, 1959. It relates that of the six plastics tested, only "linear polyethylene" had shown "no failure" when exposed to spices at high temperatures for 72 to 144 hours time.

On November 12th (11 days before the critical date) de Neveau wrote a similar memo to Foster indicating, "We have concluded our preliminary tests of the molded spice can covers as outlined in our memo of November 2." Whereas the five

others all failed at some point, "no failure of the linear polyethylene samples was apparent. This material was of experimental grade." The note concludes:

I understand that you are now in the process of obtaining a commercial grade of linear polyethylene that will test in the same manner that we did the above materials. Kindly let us know when you have samples ready for testing.[37]

On November 13, Faith wrote to Durkee's:

Under separate cover today we are mailing ten (10) sample one-pound spice cans with our round plug incorporating the plastic wheel. We are also mailing one (1) sample to Mr. D. C. Funk at The Glidden Company in Cleveland.

While those samples are still not from production tools, we believe they will work fine for all of your tests. The plastic part is linear polyethylene and has stood up under our maximum tests. We would suggest furnishing the part in color to eliminate the translucent effect, because it is possible that some spice may work its way up under the disc.

We will be most anxious to hear the results of your tests. We would like soon to get your authorization to proceed with production samples. I will be out of town this next week, but W. O. Nelson here in Lancaster will be glad to assist you in any way.[38]

The Faith deposition and other documents annexed to it indicate that plaintiff's sales activity proceeded at a brisk pace through the month of December 1959 and succeeded in producing an order from Durkee's by January 15, 1960. Plaintiff then began "tooling up" to produce the plastic-on-metal closure, and the

---

33. Faith deposition 2/25/65, p. 38.

34. D-11g.

35. Ibid.

36. These six plastics were medium impact polystyrene, high impact polystyrene, Tyril, low-density polyethylene, high-density polyethylene, and polypropelyne.

37. P-45.

38. D-11i.

first cans incorporating that closure were shipped in June 1960.

The product allegedly put on sale prior to the one-year grace period must be "the very invention patented." Chicopee Mfg. Corp. v. Columbus Fiber Mills Co., 165 F.Supp. 307 (M.D.Ga.1958). Concededly, if *any* product was put on sale before November 23, 1959, that product was the Foster spice can closure.

As to the question of what transactions constitute putting a product "on sale," the court has found the following cases pertinent:

The case of Philco Corp. v. Admiral Corp., 199 F.Supp. 797 (D.C.Del.1961) involved alleged infringement of three patents taken out on the external ornaments and physical arrangement of a portable television set called the Philco "Seventeener III." After discussing various precedent regarding the need of a contract for sale, the stages of completion required and special rules concerning "tailor made" devices, the court adopted a "competitive use" [39] test and applied it to the facts, which included a crucial date of May 10, 1958. The court found:

It would not allow pictures to be taken back to Firestone, and, as a result, both second echelon and top management at Firestone came to Philco in March, 1958. At that time, Philco had several completely operative but hand-made Seventeener III's which were going through certain final tests. No production runs had yet been made. The showing to the Firestone representatives was made with mock-ups of the Seventeener III which represented the design but would not perform electronically. The Firestone people were told that no sets would be produced or available until June, 1958 and that final prices had not been established. Nevertheless, Philco gave Firestone an estimated price range on the Seventeener III. As a result of this meeting,

Firestone, through certain documents entitled "releases," indicated the quantities they wanted delivered when the sets were available. This was accomplished before May 10. [Id. at 814.]

The court then concluded:

The March showing to Firestone was clearly a competitive use of the Seventeener III and the patents embodied therein. It was a sales effort, Philco's purpose being to sell the Firestone representatives on the new line and to persuade them to buy it. * * *

The March showing was held to display Philco's new line and to get reliable estimates of Firestone's needs. That is placing the new line "on sale." * * *

The matter relevant to the claims of the patents were settled, and Philco knew almost exactly what it was going to sell in June. The requirement of existing production models laid down in the McCreery case is inapposite here. This is not, as it was in McCreery, a situation where the invention was conceived almost simultaneously with the signing of the contract, or a situation, as in Burke where a "sample" contract is executed and neither party may know exactly what the finished article will be like. In those cases, neither the inventor nor the prospective buyer could be sure of the character of the finished product as a practical matter, simply because nothing approaching a working or finished model had been achieved. [Id. at 816, 817.]

In Chicopee Mfg. Corp. v. Columbus Fiber Mills Co., 165 F.Supp. 307 (M.D. Ga.1958), the patents concerning plastic fabrics used as seat covers for automobiles. The crucial date was March 31, 1954, and the pertinent observations of that court are:

The samples of this cloth having the saran shrinker were shown to the Lincoln-Mercury Division in February,

---

**39.** The Court correctly determined that this test is the rule of the Third Circuit, citing United States Chemical Corp. v. Plastic Glass Corp., 243 F.2d 892 (3d Cir. 1957).

1954 through Brown and as a result plaintiff received a sample order on March 4, 1954. Also, on March 10, 1954, plaintiff received written assurances from the Lincoln-Mercury Division that the cloth would be used in the 1955 Mercury Custom Station Wagon and on March 12, 1954, plaintiff received another sample order. These were engineering purpose orders and called for puffed fabrics in test sample amounts of 30 yards in each of four styles and 25 yards in each of three styles. (D–16 and D–17.) No goods were completed or shipped upon any order by Lincoln-Mercury prior to April 2, 1954. The plaintiff marked one of its invoices covering said shipments "Exptl Purpose" (P–50) by which marking plaintiff meant that said goods were shipped for experimental purposes. The fabrics shipped on April 2, 1954, were shipped within less than 24 hours after being made and were not paid for until 90 days later. These fabrics thus delivered to Ford Motor Company after April 2, 1954, were not entirely acceptable and had to undergo certain changes as to color or alterations. [Id. at 320, 321.]

On these facts, the court found (1) that it is customary in the textile industry to solicit trade from Detroit automobile manufacturers through the use of samples of the cloth offered, and (2) that production of commercial quantities of the cloth represented by the exhibited samples is deferred until orders are obtained. The court then concluded that its findings and the particular activities of the "patentee" required a holding that the products involved had been put "on sale" before March 31, 1954, the critical date.

Plaintiff has cited the case of Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corp., 316 F.2d 459 (9th Cir. 1963) where, as in the case at bar, the only

product existing on the crucial date was a model, and no contract for sale had been consummated. There, the court held that the patented product was not "on sale"; and plaintiff urges that Amerio is applicable to the present case. We do not agree.

In Amerio, the Ninth Circuit itself distinguished Chicopee on the grounds that the latter case involved sales by samples of a mass-produced product. The Amerio case concerned a large, custom-made machine for freezing packaged food. This court feels that because Chicopee did involve sales by samples, the conclusions of the court in Chicopee are pertinent and persuasive.

The Ninth Circuit also indicated that its decision in Amerio could be considered contrary to that reached by the United States District Court for the District of Delaware in Philco. Without attempting to distinguish Philco, the Amerio court proceeded to determine that no "on sale" was present in the case before it. The similarity between the facts of Philco and those of the case at bar leads this court to conclude that the reasoning in Philco is applicable here, whereas that of the Amerio opinion is not. As in Philco, plaintiff J. L. Clark, by November 23, 1959, "knew almost exactly" [40] what product it would be providing for those spice companies who ordered it. Indeed, in the case at bar, the J. L. Clark samples were completely operative prototypes whereas the Philco models were merely "mock-ups * * * which represented the design but would not perform electronically." [41] Similarly, the "sales effort" of Victor Faith and his colleagues was designed "to sell [the spice companies] on the new line and to persuade them to buy it." [42]

The "competitive use" test is an appropriate standard to apply to the facts of the case at bar. Unquestionably, by November 23, 1959, plaintiff's use of the new Foster closure was competitive,

40. Philco Corp. v. Admiral Corp., 199 F.Supp. 797, 817.

41. Id. at 814.

42. Id. at 816.

not merely experimental. Plaintiff was soliciting purchase orders, not advice. Plaintiff was actively seeking to capture customers, and the success of such efforts was imminent. Therefore, the activities of plaintiff prior to the above crucial date must be held to constitute putting the Foster closure "on sale." [43]

Defendant will submit a form of order for entry of judgment consistent with this opinion.